## Adkins v. Phipps

(Decided June 2, 1914.)

### Appeal from Pike Circuit Court.

1. Elections—Contest—Bribery—Cancellation of Certificate.—In an election contest the evidence examined and held to show such corrupt use of money by the candidate receiving the certificate of election, and such number of persons bribed to vote for him as to reduce the legal vote he received below the contestant.

2. Elections—Bribery Committed In.—The fact that a candidate had no knowledge of the bribery committed in his behalf does not legitimatize the vote so cast and counted for him.

J. E. CHILDERS for appellant.

ROSCOE VANOVER, E. J. PICKLESIMER for appellee.

OPINION OF THE COURT BY JUDGE NUNN—Reversing.

This is an election contest for the office of Justice of the Peace of the Eighth Magisterial District of Pike County. The district is composed of but one voting precinct, Lower Elkhorn, Number 13. The election was

held last November, and on the face of the returns appellee, contestee, Phipps, received a majority of three votes. He was awarded the certificate of election.

In due time, Adkins, the appellant, filed a petition contesting the election on the ground that there were cast and counted for Phipps, the contestee, the votes of ten non-residents of the State, and twenty of the county and precinct, five unpardoned convicts, ten persons under age, twenty-five who voted openly, that is, disclosed their ballot without being sworn as to disability; that while the vote was being counted by the election officers they permitted many persons to be in the room other than the officers, and that said persons were drinking and disorderly, and, in the confusion, some of them altered ten ballots which had been 'cast for contestant so as to make it appear that they were cast for contestee, and they were so counted. It is also charged that the election workers for contestee bribed eighty voters to vote for him, and against the contestant, and that this bribery was by use of large quantities of whiskey, and not less than $800 in money. It was also charged that the "Center Creek Distilling Company," and its companion corporation, the "Cumberland Express Company," under various tricks and devices, had for quite a while, flagrantly and notoriously, violated the law with reference to the sale of liquors in the magisterial district. It is alleged this Distilling Company was interested in behalf of contestee, Phipps, to secure control of the magistrate's court, and protection in its unlawful business, and that this company furnished the bribe money used to defeat contestant Adkins. It is fair to say that the proof wholly fails to connect Phipps with the Distilling Company, or the Express Company, nor was the money used in the election traced to either of them. It is also fair to state that the proof does not show that Phipps had any part in, or knowledge of the fraud or bribery. In fact, except some indirect testimony as to the Distilling and Express Companies, the proof went altogether to show the expenditure of bribe money, and voting of non-residents, as related to specific persons. Manifestly, there was unusual interest exhibited in this race and, considering the relative unimportance of the office, it is hard to understand the reason for it.

But without reference to where the money came from, it is established beyond controversy, in fact, it is

undenied, that James W. Childers, Isaac Eopling and Jess Ramey had large sums of money on the day of the election for use at this precinct, and that they were spending it to bribe persons to vote for the straight ticket of contestee Phipps' party, and particularly in behalf of Phipps. Eopling admits having spent as much as $250, and Childer admits spending $35, and that he paid from $5 to $8 apiece to persons to vote the Phipps ticket. When Eopling and Childer are questioned as to whom they bribed, they decline to answer on the ground of self incrimination. Eopling admits that "he gave several people money, but did not remember who all."

Jess Ramey did not testify at all. Neither did his brother, Dave Ramey, testify. Dave Ramey was a member of the Phipps party, and sheriff of the election. It is proved and undenied that some forty voters had their ballots marked for them in plain view on the table by the officers, and while they were all sworn as to disability, yet with very few exceptions these voters lied, for there was no real or apparent disability. Nearly all of these sworn fellows voted the Phipps ticket, and quite a number of others who voted in the booths showed their ballot to the election officer, Dave Ramey, and immediately after these fellows voted on the table, and the others showed their ballot in the booth, Dave Ramey would go to the door, or outside of the polling place, and have conversations with or make signs to his brother, Jess Ramey, who was working and spending money on the outside for the Phipps ticket. The proof discloses the purport of some of these conversations, and in such cases, Dave Ramey was heard to tell Jess Ramey that the person voted alright.

It is established with reasonable certainty that there were five voters, viz.: Amazior Potter, Cleve Hogston, A. J. Huff, Rube Morgan and Al Osborn, who were non-residents of the State, or had not lived in the county or precinct the requisite length of time, and were permitted to vote for Phipps. If there is any doubt in the case of these voters, it is as to whether they voted for Phipps. That they did, we think the proof is pretty plain, and there is no attempt to show otherwise; but, giving Phipps the benefit of the doubt, if any there be, this case may rest wholly upon the question of bribed votes. Take first the names of Tom Mullins, Sherman Mullins, Harrison Mullins, James Hackney and Tom

Hackney, for these five seem to have been handled by the bunch. They all voted openly, after taking the oath of physical disability, although it is shown that Tom Mullins is the only one of them who could at all have come within that class. Charles Rowe swears that he saw Jess Ramey with the money, and heard him offer them $7.50 each to vote for Phipps' ticket, and that they agreed to take it, and went then direct to the polling place. These were among the number of voters reported on by Dave Ramey, the election officer, to Jess Ramey on the outside. Tom Mullins told Ellis Potter, as Potter swears, that they got $7.50 each, and Ramey told him on election day that he had $7.50 for every voter in the precinct. No witness, not even the voters named, deny any of this.

John Bartley is another person whom the proof clearly establishes as having been bribed to vote for Phipps. James Potter swears he saw Jess Ramey trying to get John Bartley to go and vote, and he did vote. That Dave Ramey, the election sheriff, came outside, and he heard him tell Jess Ramey that John Bartley voted alright. Then Jess and John went off together behind the school house. Wm. Bartley swears that he saw Jess Ramey take John Bartley behind the school house and give him some money just after he had voted. It may be noted again that Dave Ramey, Jess Ramey and John Bartley let these facts go undisputed, and neither of them testify.

A couple more fellows are shown to have been bribed, and it is fairly well established that they voted for Phipps. Their names are Alex. Hackney and Bev. Wallace. Wallace is generally known as "vote selling Bev." This is rather an indefinite, as well as unenviable distinction since the proof shows that from 30 to 40 per cent of the voters in that precinct are guilty of the same practice.

Two boys, I. B. Swinney and Arvid Ratliff, saw Isaac Eopling take Hackney and Wallace to a closet in the rear of the school house. These boys followed, and when Eopling came out they went in. Hackney was counting some money, and when the boys came in Hackney and Bev stepped out, and went behind the closet. and, through a crack, the boys saw them divide the money, which was about $25, as well as the boys could tell from the size of the bills they saw. These fellows

voted on the table, and while the proof is not positive, it is shown by a man who saw them vote, that "according to his best recollection," they voted for Phipps. Neither Eopling, Hackney or Wallace made any denial of this testimony, so it is clearly established that eight persons were bribed to vote in this election, and it is definitely shown that five of them voted for Phipps, and it is shown with almost equal certainty that the other three voted the same way. These bribed voters alone are enough to change the result of the election, for a bribed vote is no vote at all. Deducting these from the vote counted for Phipps, it shows that Adkins received a majority of the votes in that precinct.

There was no attempt to prove that Adkins or his party used any money, or bribed any person to vote for him, or that any person voted for him who, for any cause, had no right to do so. Phipps seems to rest his defense on the sole ground that he was not a party to the bribery in his behalf, and had no knowledge of it, and his counsel by brief submit the case to this court to determine whether the proof shows that eight of the voters above named were bribed to vote for Phipps, and if we so determine, we are asked to set aside the election as to this office, and declare there was no election, but, as above indicated, the proof does not leave the matter in doubt as to who was elected. There is not the least evidence that Adkins received any less number of votes than were counted for him, or that any of those cast and counted for him should not have been. All the proof goes to reduce the number of votes cast and counted for Phipps. Deducting the bribed votes there is no doubt but what he received a less number of votes than Adkins, and was therefore not elected. The only element of doubt is as to how many votes less than Adkins he did receive. On this state of the record there is absolutely no reason for throwing out the election.

The fact that Phipps had no knowledge of the bribery committed in his behalf does not legitimize the vote so cast and counted for him. It is a plain question as to whether he received a majority of the legal votes cast. The bribed votes were illegal whether he knew of them or not. As is stated in the case of Butler v. Roberson, 158 Ky., 101, "Nor is it necessary that the improper use of money should be traced directly to the candidates for office. The position or personality or connection

with the election of the person using the money is of minor importance compared with the fact of its use.''

We commend to the grand jury of Pike county for their most careful consideration the facts brought to light by this case, and as in the recent Hackney-Justice case from the same county, express the hope that all guilty of bribery be brought to punishment. The strange conditions that make this office so highly prized should also be investigated.

For the reasons indicated the judgment is reversed with directions to cancel this certificate, and award the office to the appellant, Adkins.