Jacob Van Der Zee et al., Contestants, Appellants, v. Everett Means et al., Incumbents, Appellees.

No. 44216.

872

SEPTEMBER 27, 1938.

PETITION FOR REHEARING DISMISSED APRIL 7, 1939.

D. C. Nolan and G. P. Linville, for contestants, appellants.

William R. Hart and Robert L. Larson, for incumbents, appellees.

MILLER, J.—The contention of the contestants requires the recital of certain events preceding the election in question.

The Iowa City Light & Power Company for a number of years distributed electricity in Iowa City under a franchise which expired in January 1934. On October 11, 1932, a special election was held in said city at which was submitted to the voters the question of the renewal of said franchise for a period of 25 years, and at which election the renewal thereof was defeated by a vote of approximately 3 to 1. On April 17, 1934, a special election was held in said city for the purpose of voting on an issue of $917,000 of revenue bonds for the establishment of a municipally owned electric light plant and distribution system, which proposition carried by a majority of 155 votes. Following the special election in April 1934 an ordinance was introduced before the city council providing for the establishment of a municipally owned plant which was tabled, and in October 1934 the same council returned unexecuted to the Federal government a PWA contract for a loan and grant which had been requested by the city, and which had been allocated by the PWA.

At the regular city election in Iowa City in March 1935 the ballot contained a Municipal Ownership Non-Partisan ticket, as well as the Republican and Democratic tickets. At this election all candidates upon the Municipal Ownership Non-Partisan ticket were elected; following which the new council took office the fore part of April 1935; enacted the ordinance that had been tabled in 1934; and filed a new application with the PWA for a loan and grant in connection with the construction of said plant, which was later changed to an application for a grant only. In August 1935 a grant was made to the city of $413,000, of which amount nearly $30,000 was advanced. The council then engaged engineers to prepare plans and specifications and published notices in December 1935 calling for bids on the light plant and equipment. However, all further progress of the council relative

to letting any construction contract, or proceeding with the construction of the plant and distribution system, was stayed by an injunction, which enjoined the council from using tax funds in connection with said project; and by a restraining order procured by the light and power company which prohibited the advancement of any further PWA funds to the city, and likewise enjoined the city from doing any act or things in furtherance of the plan of erecting and acquiring a municipally owned plant.

At a meeting of the council on May 27, 1935, a resolution was adopted directing the Iowa City Light & Power Company to submit to the city a sale price for its electric distribution system in Iowa City and immediate vicinity. On June 20, 1935, the company replied thereto by a letter addressed to the mayor and city council, therein refusing to dispose of its distribution system only, but therein offering to sell its entire electric property, consisting of power house, dam, water rights, transmission lines and distribution system, for the sum of $1,125,000. In that letter the company also proposed that if purchase of its entire electric property was not consummated, that it would reduce the rates upon electric current furnished by it, and therein submitted a schedule of rates under such proposed reduction; stating however in its offer to so reduce rates, as follows:

"Confronted, as the Company is, by ouster proceedings with the threatened destruction of its property and probable protracted litigation, it must seem reasonable that the Company would not unconditionally lower its schedule of rates now in effect unless the threat of municipal ownership is withdrawn, and we, therefore, propose that the foregoing rates shall be applicable only after the City has taken some action indicative of the abandonment of the municipal ownership plan. Therefore, effective on the date of the first meter readings in July, the Company proposes to keep the records of each customer so as to show the amount of the monthly charge for electricity on the basis of the present rates, upon which basis payment will be made. The Company will also keep the record of the customers' accounts on the basis of the reduced rates herein proposed. The difference between the two accounts will be impounded and paid to each customer immediately upon the abandonment by the City of its present intention to establish a municipal electric light and

power plant and distribution system, and the reduced rates will be effective thereafter.''

On June 27, 1935, the mayor and council wrote a letter to the light and power company, therein stating that the company's offer to sell its entire electric property for the sum of $1,125,000 could not be accepted as the voters at the election in April 1934 had authorized an expenditure of only $917,000 for the establishment of a complete plant and distribution system. This letter also stated that the proposed rate contract of the company was of doubtful enforceability and that municipal ownership could not be abandoned in exchange for an unenforceable and temporary rate agreement. The light and power company on July 5, 1935, replied thereto, stating that for the sole purpose of removing any doubt as to the enforceability of its rate reduction proposal, it was willing to grant the city a five-year option to purchase for a consideration of $900,000, plus net additions after July 1, 1935, the entire electric plant and electric distribution system of the company, including the dam in Coralville and transmission lines to Iowa City; such proposed option to be exercisable only upon the company's failure to abide by the terms of the reduced rate proposal; and that the consideration for said option would be the abandonment by the city council of its intention to establish a municipal light plant and distribution system. The record contains no mention of any further communication between the council and the light and power company.

Commencing with the month of August 1935, and every month thereafter, the Iowa City Light & Power Company sent to each of its electricity consumers, some 5,500 in number, a monthly notice therein referring to the contents of its two letters of June 20, 1935, and July 5, 1935, to the mayor and council; stating that, in conformity with its reduced rate proposal, it was keeping a record of each account on the basis of the proposed reduced rates in addition to the record of each account on the present rates; that the difference between the two accounts was being impounded and would be paid each consumer in cash whenever the council abandoned its plans for a municipal light plant; and each of said monthly notices also showed the exact amount impounded to the credit of the customer. Likewise, during the period from August 1935 to March 1937, the company openly

advertised in the local newspapers of Iowa City that these impounded funds would be paid its customers whenever the city council abandoned its plans for a municipal light plant. This amount of impounded funds naturally increased every month, and in February, immediately preceding the city election held on March 29, 1937, this fund had reached a grand total of $72,294.42.

On March 5, 1937, at a convention held in Iowa City, a ticket known as the Citizens Non-Partisan ticket was selected for the city election to be held on March 29, 1937. At this convention the incumbents were selected as candidates for the city council; and a platform was adopted in which was included the following plank:

"We pledge strict and fair regulation of our public utilities so that essential services may be supplied to the consumer at minimum cost now, and whatever future profits may accrue will be equitably shared among the rate payers, the taxpayers and the owners of these properties.

"We are opposed to the building of a municipal light plant or to any other project which involves the city in further obligation without bringing the citizens increased benefits. WE BELIEVE THAT NO FRANCHISE SHOULD BE GRANTED TO ANY PRIVATELY OWNED LIGHT AND POWER COMPANY UNTIL THEIR CONTINUED WILLINGNESS TO SERVE THEIR SUBSCRIBERS EFFICIENTLY AND AT RATES JUSTIFIED BY THEIR INCOME, HAS BEEN PROVEN TO THE VOTERS' SATISFACTION."

On March 7, 1937, a convention was held by the Municipal Ownerhsip League, wherein the contestants were selected as candidates for the city council, which convention adopted a platform again favoring the building of a municipal light plant. Both platforms were widely and generally circulated in Iowa City prior to the election.

In the notices of contest appellants claim that the incumbents are not eligible to hold, and were not legally elected to the offices of councilmen, for the reason that as candidates for such offices they concurred in, joined with, and were parties to an offer made by the Iowa City Light & Power Company, to bribe and illegally influence the voters in the aforesaid city election, in the election of incumbents to the offices of councilmen; it being the contention of appellants that the offer of the Iowa City Light

& Power Company to reduce electric rates and to pay each electricity consumer a definite sum in cash, conditioned upon the city council abandoning plans for building a municipal plant, was an offer of a bribe made for the specific purpose of influencing all electric consumers, as electors, to elect to the city council candidates who publicly announced they were opposed to building a municipal plant, and that appellees acquiesced, joined in and ratified said offer of the light and power company, and thereby became parties to an offer of bribes to the electors.

Section 981 of the 1935 Code sets out the grounds upon which an election of a candidate for office may be contested by any person eligible to such office, and contains seven separate grounds of contest. The actions involved herein are all predicated upon the fourth ground thereof, which reads as follows, to wit:

"That the incumbent has given or offered to any elector, * * * any bribe or reward in money, property, or thing of value, for the purpose of procuring his election."

Appellants contend that the action of the light and power company in mailing monthly notices to each of its 5,500 customers, of its offer to reduce rates and pay in cash the impounded funds when the city council abandoned its plans for the construction of a municipal plant, constituted bribery upon the part of said company to influence electors to vote for candidates opposed to building a municipal plant. However, we do not find it necessary to determine whether or not this conduct on the part of the light and power company did in fact constitute bribery. Without determining that question, but conceding for the purpose of analysis only, that this conduct constituted bribery, the same could not and would not invalidate the election of appellees, unless by some act or conduct upon their part they acquiesced in, and approved and ratified such offers on the part of the light and power company, and thereby in effect became parties to such offer. The very wording of the statute in question requires that the incumbent himself must have given or offered to an elector a bribe or reward in money, property, or thing of value, for the purpose of procuring his election.

Appellants recognize the necessity of establishing the acquiescence in and the approval and ratification of the claimed bribery by the incumbents themselves, and claim that the facts hereafter set out establish such acquiescence in, and approval and

ratification of such claimed bribery. In January 1934 there appeared in Iowa City an organization known as the Iowa City Consumers Protective Association of which organization Herman Smith was president, Will J. Hayek was secretary-treasurer, and Dr. D. F. Fitzpatrick was a member of the board of directors. This organization, through advertisements in newspapers and through circulars distributed among the voters, conducted a very active and intensive campaign against the proposal to establish a municipally owned plant preceding the special election of April 1934, and likewise, preceding the city election of March 1935, actively campaigned against the candidates on the municipal ownership ticket. Following said election of March 1935 this association continued to carry on its very active and intensive campaign unfavorable to municipal ownership, and in favor of the abandonment of the plans for the construction of a municipal plant, and the acceptance of the reduced rate schedule and impounded funds as proposed by the light and power company. Said Herman Smith, Will J. Hayek and Dr. D. F. Fitzpatrick were active in the convention at which the Citizens Non-Partisan ticket was nominated, and also active in the campaign preceding the March 1937 election in behalf of the appellees. Appellants claim that there was a conspiracy between the light and power company, the Consumers Protective Association and the Citzens Non-Partisan organization to elect appellees to the city council for the purpose of abandoning the plans for the municipal plant then in the process of execution, and base this contention upon the association of Herman Smith, Will J. Hayek and Dr. Fitzpatrick with the Consumers Protective Association and the Citizens Non-Partisan organization. The evidence establishes that Herman Smith is a member of the firm of Smith & Berger, general contractors in Iowa City, which firm has done work for the light and power company as independent contractors on a cost-plus basis; that Will J. Hayek, although not a regular counsel for the company, had been retained on two or three occasions as its attorney in particular matters; and that Dr. Fitzpatrick was the regular physician for the company. This evidence constitutes the basis of appellants' contention of such conspiracy, but the record fails to reveal any showing whatever that the company had anything to do with the organizing, financing or determining policies of either of said organizations. Each of the incumbents testified that he was opposed to municipal ownership in

Iowa City; that he had been so opposed long before becoming a candidate, and had joined with other citizens similarly opposed in organizing the Citizens Non-Partisan party for the purpose of combatting municipal ownership. None of the appellees was approached or talked to by any representative of the light and power company relative to being a candidate on the Citizens Non-Partisan ticket, other than appellee John Ostdiek, who was first approached by Will J. Hayek, who, as we have heretofore shown, had had occasional employment as an attorney for the light and power company. With this record before us we are unable to agree with the contention of appellants that there existed a conspiracy between the light and power company and the appellees; or that the evidence establishes such acquiescence in, and approval and ratification of the claimed bribery of the light and power company by appellees as to make them parties thereto.

 The result of this conclusion leaves remaining for our determination the question of whether or not appellees must be disqualified from holding the offices to which they were elected, for the reason that at the time they were candidates for election upon the Citizens Non-Partisan ticket, upon a platform opposed to municipal ownership, that they knew that the light and power company had for some eighteen months been informing their customers by monthly circulars, and by advertisements, that such customers would be paid in cash the impounded fund amounting to over $72,000 upon the abandonment by the council of its plans for the construction of a municipal light plant. The evidence is undisputed that each of the appellees was opposed to municipal ownership, and without any showing that they were parties to the offers made by the light and power company, we do not believe that they were disqualified under the quoted section of the Code of Iowa relevant thereto. If the contention of appellants is to be sustained and appellees are to be disqualified on account of being candidates upon a ticket opposed to the principle of municipal ownership, the result of necessity must be that the offer made by the light and power company to the city council and to their customers precluded all possibility that any group of candidates could have run in 1937 on a platform opposed to municipal ownership. The fact that some third person may have given or offered a bribe for the purpose of procuring the election of some candidate certainly should not

880

be construed as disqualifying the particular candidate from holding office, unless of course the candidate actually participated therein and approved thereof.

Appellants cite numerous cases to the effect that the giving or offering of a reward, money or thing of value *by a candidate* to an elector for the purpose of influencing his vote, disqualifies the candidate from holding office, and include therein the Iowa case of Carrothers v. Russell, 53 Iowa 346, 5 N. W. 499, 36 Am. Rep. 222. We are heartily in accord with the principle of law pronounced in each of those cases, but are not here confronted with a state of facts wherein said principle is applicable, and being convinced that appellees herein were not parties to the claimed bribery, it follows under the provisions of the statutory law of this state that they were not disqualified from holding the offices to which they were elected.

The trial court rendered its decision on July 15, 1937, and on the same date appellants served and filed their notice of appeal. Thereafter, on the 31st day of August, 1937, appellants filed a motion for new trial; therein alleging that during the month of August 1937, the city council of Iowa City enacted an ordinance repealing the ordinance passed by the previous council providing for the establishment of a municipal light plant and distribution system in Iowa City; and likewise passed a resolution surrendering the grant of $413,000 from the PWA; and that on the 25th of August, 1937, the light and power company paid to their consumers the impounded funds. Therein they claimed that said facts constituted competent newly discovered evidence sufficient to warrant a new trial. The trial court overruled this motion for new trial, and appellants now contend that the overruling of said motion for new trial was erroneous. We find it unnecessary to determine whether or not these alleged facts occurring subsequent to the trial come within the rule announced in Guth v. Bell, 153 Iowa 511, 133 N. W. 883, 42 L. R. A. (N. S.), 692, Ann. Cas. 1913E, 142, to the effect that acts and declarations, subsequent to the trial, made by the successful party and inconsistent with his right to recover, may be shown as a ground for a new trial. Such facts must be material and have definite probative value, and we fail to see where these claimed facts would prove of value to appellants. Such action upon the part of the city council was simply the fulfillment and carrying out of the platform plank of the Citizens Non-Partisan party rel-

ative to municipal ownership. Finding as we do that the evidence fails to show that appellees were disqualified on account of having participated in the offer of a bribe, this subsequent action could not be held to establish that thereby they did participate in the offer of a bribe. Having reached the conclusion herein set out, it follows that the action of the trial court must be and the same is hereby affirmed.

In view of the conclusions that we have reached upon the merits of the case, it is unnecessary to pass upon the motion of the appellee R. J. Phelps to dismiss the appeal of appellant George E. Johnston.—Affirmed.

STIGER, C. J., and MITCHELL, SAGER, and DONEGAN, JJ., concur.

KINTZINGER and RICHARDS, JJ., dissent.

KINTZINGER, J. (dissenting)—The record in this case shows a persistent and determined effort on the part of the public utility company in Iowa City to defeat the efforts of the people to secure a municipally-owned electric light and power plant.

The light and power company's franchise expired in January 1934. A special election was held on October 11, 1932, at which the renewal of the company's franchise was defeated by a vote of 2,700 to 900. Thereafter on April 17, 1934, another special election was held for the purpose of voting on a $917,000 bond issue to establish a municipally-owned plant. This issue was carried by a majority of the voters.

Pursuant to that election an ordinance was introduced for the establishment of a plant. This ordinance was laid on the table by a majority of the then constituted membership of the city council. That council also returned to the federal government a P. W. A. contract for a grant of over $400,000 to aid in the construction of the plant. Another city election was held in March 1935, at which the municipal ownership candidates were elected by a majority. This council then proceeded to carry out the provisions of the election for a municipally-owned plant and adopted the ordinance which had been laid on the table in 1934, providing for the establishment of the plant. Thereupon the city again made arrangements for receiving a federal grant of $413,000 to aid in the construction of the plant.

In May 1935 the city council asked the power company to

sell its distribution system to the city. The company refused to do that, but offered to sell its generating plant in Coralville and its distribution system to the city for $1,125,000, an amount far in excess of the bond issue authorized by the people.

On the rejection of its offer, the company commenced a systematic campaign against municipal ownership, and secured a temporary injunction restraining the city from proceeding with the establishment of the plant as authorized by the people. Upon the rejection of the offer, and after securing a temporary injunction, the company offered to the city and all consumers an immediate but conditional reduction in rates, and a scheme of paying its consumers the difference between the reduced rates and the rates then in operation, upon condition however that the city council abandon its plan for a municipal plant. This offer was refused.

Thereupon the light and power company in the month of August, and every month thereafter until the next city election, sent monthly notices to each of its consumers showing how much money had been impounded for each consumer, promising to pay this amount to them in cash upon the abandonment of the plans for a municipal light and power plant by the city council. The light company also publicly advertised by hand bills and in the local newspapers that the impounded fund would be paid to their consumers if and when the city council abandoned plans for a municipal plant. The record shows that the impounded fund accumulated to such an extent that it amounted to over $72,000 immediately preceding the city election in February 1937.

The promise of such reward for the abandonment of the plan was given such wide publicity and sent to all consumers of electricity in Iowa City so repeatedly before the election of 1937 that it must have been known by the appellees herein.

In March preceding the election a convention was arranged for and held in Iowa City by friends of the light and power company. At this convention a ticket, opposed to municipal ownership and designated as the Citizens Non-partisan Ticket, was selected. The appelles herein were at that time and by that convention nominated as candidates for the city council in the city election to be held March 29, 1937. At this convention a platform was adopted and published wherein it was stated, inter alia, that *"we are opposed to the building of a municipal light plant in Iowa City."*

The appellees in this case were the persons nominated by the so-called Citizens Non-partisan Ticket and made their campaign upon the platform adopted by the convention as being opposed to the building of an electric light plant in Iowa City. A bitter campaign was waged between the forces favoring a municipally-owned plant and those opposed thereto, at the end of which appellees, the candidates on the Citizens Non-partisan Ticket, were elected.

The record shows without dispute that all consumers of electricity in Iowa City were repeatedly promised a cash refund if the candidates on the municipal ownership ticket were defeated and the plan for municipal ownership abandoned. This action is brought to contest the election under section 5629 of the Code of 1935, which provides:

"The election of any person to a city or town office may be contested on the same grounds and in the same manner provided for contesting elections to county offices."

Section 981 of the Code of 1935 relating to contesting the election of county officers provides, among other things, as follows:

"The election of any person to any county office * * * may be contested by any person eligible to such office; * * * and the grounds therefor shall be as follows:

"4. That the incumbent has given or offered to any elector, * * * any bribe, or reward in money, property, or thing of value, for the purpose of procuring his election."

In Dishon v. Smith, 10 Iowa 212, bribery was defined as:

" * * * the giving (and perhaps offering) to another, anything of value or any valuable service, intended to influence him in the discharge of a legal duty. * * * Our statute * * * declares (section 339) that the election of any person may be contested when the incumbent has given or offered any elector, etc., any bribe or reward in money or property for the purpose of procuring his election."

The provision of the statute in force at that time is substantially similar to paragraph 4 of section 981 of the Code of 1935. It is therefore clear, and it is practically conceded by the record, that if the offer of money, service, or reward had been

made directly by the appellees, who were elected members of the city council at the election in question, their election would be invalid. Appellees contend, however, that the offer of reward was not made by them directly and that they are therefore not responsible for the offers made by the light and power company.

Appellants contend, however, that while the offer was not made directly by appellees, the record shows without dispute that they were running on a platform opposed to municipal ownership and thereby indirectly ratified the promises made by later adopting the legislation necessary to enable the electors to secure the money promised them by the light and power company. The platform of the convention, under whose auspices and upon whose ticket appelles were running, was an implied promise that they would do all in their power to defeat municipal ownership in Iowa City; and, as contended by appellants, "this promise was a political party declaration, ratified by its candidates that if elected they would not build a municipal plant, and this act of forbearance would necessarily result in the payment of the money promised by the light and power company in the event of the defeat of municipal ownership in Iowa City."

Under the special circumstances existing in Iowa City, appellees impliedly promised the electors some thing of real value, because the light company's promise was followed up by appelles' action, as councilmen, in repealing the ordinance providing for a municipal light and power plant almost immediately after the election. This action of the council was something of real value. While the promise of either the electric light company to make a refund, or the promise of appellees to defeat municipal ownership in Iowa City, made by the appellees before the election, might not separately, in and of themselves, have amounted to a complete offer of reward, it does follow that when linked together in the manner shown by the evidence in this case it amounted to an implied offer of reward as an inducement for their election.

The record shows that soon after the appellees were elected they repealed the ordinance providing for the establishment of a municipal light and power plant; and immediately thereafter the light and power company refunded to its consumers over $90,000 which it had impounded for them under its promise made about a year and a half before the election.

That such action amounted to an offer of reward as an

inducement for their election, see: Carrothers v. Russell, 53 Iowa 346, 5 N. W. 499, 36 Am. Rep. 222; Glover v. State, 109 Ind. 391, 10 N. E. 282; Robinson v. United States, 8 Cir., 32 Fed. 2d 505, 66 A. L. R. 468; Commonwealth v. Root, 96 Ky. 533, 29 S. W. 351; Chicago, M. & St. P. R. Co. v. Shea, 67 Iowa 728, 25 N. W. 901, 904; State v. Purdy, 36 Wis. 213, 224, 17 Am. Rep. 485.

In Carrothers v. Russell, 53 Iowa 346, 5 N. W. 499, 36 Am. Rep. 222, this court said [page 349, of 53 Iowa, page 501 of 5 N. W.]:

" 'It contains a distinct proposition to the electors that if they will elect the particular candidate he will donate all fees received from the office, in excess of a certain sum, to the taxpayers of the county by paying the same into the county treasury. Such a proposition introduced into elections would be a mischievous element very nearly allied to bribery, and if the incumbent (Mr. Russell) indorsed the resolution and pledged himself publicly and privately that, if elected to the office, he would carry out the proposition, then as I have before explained he is, under the law, disqualified from holding the office; and this is so without regard to whether there were few or many votes changed thereby. * * * '

"It is true that in that case [State v. Purdy, 36 Wis. 224] the court did not go further than to hold that the votes secured by the relator by reason of his offer should be rejected. If an offer like the one in question, when acted upon by a voter, becomes to him a bribe, it is, when not acted upon, the offer of a bribe; and under our statute the offering of a bribe by a candidate disqualifies him for the office. In our opinion the offer made by the incumbent was the offer of a bribe, and that by such offer he became disqualified for the office. * * *

" 'It is of the highest importance that the purity of the ballot box shall be maintained. And there can be no difference in principle between the sale of an office for a valuable consideration, and the disposing of it to the person who will perform its duties for the lowest compensation. The same objection lies to both. It is inconsistent with sound public policy and tends to corruption. It diverts the attention of the electors from the personal merits of the candidates to the price paid or the cheapness of the offer. If it were allowed it is evident that there would be the

greatest danger of offices being filled, not by those best qualified, but by those whose purses enabled them to obtain it.' * * *

" 'We fully recognize the validity of the objection to the sale of offices, whether viewed in a moral, political, or legal aspect. It is inconsistent with sound policy. It tends to corruption. It diverts the attention of the electors from the personal merits of the candidates, to the price to be paid for the office. It leads to the election of incompetent and unworthy officers, and on their part to extortion and fraudulent practices to procure a remuneration for the price paid. Nor can we discover a difference in principle between the sale of an office and the disposing of it to the person who will perform its duties for the lowest compensation. In our opinion the same objection lies to both.' "

In State v. Elting, 29 Kan. 397, the court, speaking through Justice Brewer, later of the United States Supreme Court, said:

"When a candidate gives an elector personally money or property there is a direct attempt to influence his vote by pecuniary considerations. The expectation is that such vote will be controlled, not by the elector's judgment of the fitness of the candidate for the office, but by the pecuniary benefit he has received. In other words, it is money and not judgment which directs the ballot; and so the election turns not on considerations of fitness or public good, but of private gain. Let such be tolerated, and elections will be simply the measure of the size of the candidates' purses. In the closing and degenerate days of Rome's august empire, preceding its immediate downfall, the imperial purple was sold at public auction to the highest bidder. Equally base and equally significant of present decay and impending downfall would be the toleration of the private purchase of electoral votes. That which is wrong when done directly, is equally wrong when done indirectly. Salaries are paid by taxation, and when a candidate offers to take less than the stated salary, he offers to reduce pro tanto the amount of taxes which each individual must pay. If the candidate went to each elector and offered to pay one dollar of his taxes, that clearly would be direct bribery; and when he offers to take such a salary as will reduce the tax upon each taxpayer one dollar, he is indirectly making the same offer of pecuniary gain to the voter; so that those cases rest upon the simple proposition that the elec-

tion of a candidate for office cannot be secured by personal bribery offered directly or indirectly to the voter. * * *

"A further question may arise when the offer of the candidate carries with it no pecuniary benefit to the voter. As, for instance, should a candidate for a county office offer to give if elected a portion of his salary for the erection of a public fountain; or, if a candidate for a state office should offer if elected to endow a chair in some college: here it may be said that the voter is in no way influenced by consideration of personal gain. He receives no money in hand, his taxes will not be reduced, and he may in no manner be pecuniarily benefited by the donation. This presents a case going still beyond those which have been decided, and yet very probably the same decision should control such a case, and for this reason: wrong considerations are thrown into the scale to influence the vote of the elector. The theory of popular government is that the most worthy should hold the offices. Personal fitness—and in that is included moral character, intellectual ability, social standing, habits of life, and political convictions—is the single test which the law will recognize. That which throws other considerations into the scale, and to that extent tends to weaken the power of personal fitness, should not be tolerated. It tends to turn away the thought of the voter from the one question which should be paramount in his mind when he deposits his ballot. It is in spirit at least bribery, more insidious, and therefore more dangerous, than the grosser form of directly offering money to the voter."

McCrary's Treatise on the American Law of Elections, 3d Ed., section 298, says:

"In England and in many states of the union, it is expressly provided by law that bribery in procuring an office creates a disability to holders. Such is the case especially in Iowa, in Kansas, in Oregon. * * * "

It goes without saying that the action of the city council in abandoning the municipal ownership plant in Iowa City made it possible for the electric light and power company to fulfill its offer to refund to the consumers of light in Iowa City funds amounting to over $90,000, if the municipal ownership plant in Iowa City was abandoned. Such abandonment could only be accomplished by the action of the newly elected city council. The

offer was made good by the payment of this large amount to the electors of Iowa City in consideration of the election of appellees, who were candidates upon the ticket opposed to municipal ownership. The election was tainted with fraud and carried by and through the action of both the light and power company and the candidates of the Citizens Non-partisan Ticket.

As a general rule an election which is materially influenced by bribery is void. Except in some jurisdictions the election of a particular person to an office may be annulled on account of bribery committed in his behalf without his knowledge. 20 C. J. 186, 187; Adkins v. Phipps, 159 Ky. 349, 167 S. W. 134; Scholl v. Bell, 125 Ky. 750, 102 S. W. 248.

Ordinarily a limit is placed upon the expenditure that may be incurred by or on behalf of a candidate, and while he may bar himself from office by violating such provision, it seems clear that expenditures of money for a candidate *without his knowledge or consent* should not work a forfeiture of his office. 9 R. C. L. 1189, Note 1; State v. Bland, 144 Mo. 534, 46 S. W. 440, 41 L. R. A. 297.

It may be, as shown by the foregoing cases, that where the expenditure of money is made in behalf of certain candidates without their knowledge, there should be no forfeiture; but if the money is spent *with* their knowledge and implied consent, a different rule should apply.

In the case of Adkins v. Phipps, 159 Ky. 349, 167 S. W. 134, the Supreme Court of Kentucky, in ruling upon a somewhat similar question, said [page 135]:

"There was no attempt to prove that Adkins or his party used any money, or bribed any person to vote for him, or that any person voted for him, who, for any cause, had no right to do so. Phipps seems to rest his defense on the sole ground that he was not a party to the bribery in his behalf, and had no knowledge of it, and his counsel by brief submit the case to this court to determine whether the proof shows that 8 of the voters above named were bribed to vote for Phipps, and, if we so determine, we are asked to set aside the election as to this office, and declare there was no election. * * * The fact that Phipps had no knowledge of the bribery committed in his behalf does not legitimize the vote so cast and counted for him. It is a plain question as to whether he received a majority of the legal votes

cast. The bribed votes were illegal, whether he knew of them or not. As is stated in the case of Butler v. Roberson, 158 Ky. 101, 164 S. W. 340:

" 'Nor is it necessary that the improper use of money should be traced directly to the candidates for office. The position or personality or connection with the election of the person using the money is of minor importance compared with the fact of its use.' "

Under the theory of this case, it does seem to me that if offers of reward were made to a sufficient number of voters to indicate that they were influenced by such offers, then the votes cast for the persons in whose behalf the offers were made should be declared illegal.

The record shows that notices of refund were sent out to about 5,500 consumers in Iowa City. The record also indicates that there are not that many electors in the city. It is therefore fair to presume that a sufficient number of electors were influenced by the promise of the payment to them of a refund on their electric rates upon condition that the plan for a municipal plant be abandoned by the city, and this could be done only by the successful candidates on the ticket opposed to municipal ownership.

It is no doubt true that many of the electors opposed to municipal ownership might not have been influenced by the offer of reward made by the light and power company, but, in view of the fact that the electors at an election for a renewal thereof refused to renew the light and power company's franchise, and in further view of the fact that the proposition for a municipal light and power plant had once been carried by a majority of the electors, it is fair to assume that enough of the electors voting at the election for councilmen were sufficiently influenced by the offers of reward made by the utility company to affect the result of that election.

Under all the facts and circumstances in this case it seems to me that the entire election was tainted by fraud and should be declared invalid. The judgment of the lower court should therefore be reversed, and I respectfully dissent from the majority opinion.

RICHARDS, J. (dissenting)—The majority opinion concedes "for the purpose of analysis only" that the conduct of the Iowa

City Light and Power Co. "constituted bribery". The opinion then holds that this conceded bribery "could not and would not invalidate the election of appellees, unless by some act or conduct upon their part they acquiesced in, and approved and ratified such offers on the part of the light and power company, and thereby in effect became parties to such offer". The opinion then makes reference to the record and therefrom concludes that "without any showing that they (appellees) were parties to the offers made by the light and power company, we do not believe that they were disqualified under the quoted section of the Code of Iowa relevant thereto". It is with this finding of fact, to the effect that in the record there is no showing of appellees' approval, ratification, and acquiescence in the offers of bribes for votes for their election, so that in effect they became parties thereto, that I am unable to agree.

The campaign of conceded bribery was commenced well in advance of the election. Monthly during the intervening 18 months offers of money were mailed to approximately 5,500 users of electricity. The amount offered increased as the months went by. This spreading out process, and the denominating of the offered bribes as "refunds", added nothing of respectability to the thing evidently intended and actually accomplished, which was the building up, for this election, of a bribery fund of something over $72,000 to be paid to procure votes for candidates to the city council who, when thus elected, would abandon the municipal plant project.

With this bribery what was appellees' relationship? Worthy of more than passing notice is the point in time, in the chronology of these events, at which appellees projected themselves into this situation they saw and well knew, and sought for themselves these public offices. That is, at the time appellees chose to attempt to acquire these offices the bribe had been built up in its completeness of over $72,000, as appellees knew. It was being dangled before the voters' eyes, as they also knew. Whatever votes a corruption fund of $72,000 would attract were "in the bag", for whoever were to be candidates opposed to the municipal plant project, as appellees also knew. But into whose particular bag were these votes to go? Who as office seekers were to become the beneficiaries of the campaign of bribery? The answer to these questions was spoken by appellees. And they made their answer sure and certain, when they had procured their nomina-

tion. Their answer was that the votes were to be theirs. They were to be the beneficiaries. Assume what would have been the conduct of a person *known* to be seeking office with the aid of bribery. Compare that conduct with appellees'. Distinguishment is not possible. Identity of conduct in the supposed case, with that of appellees, is what appears, in deadly parallel. There is no distinguishment of appellees' conduct by any disavowal of their willingness to accept purchased votes, or by criticism of debauchery of the electorate, or by any proposal that the offer of the bribe be withdrawn to the end that appellees be elected cleanly, and the question of the abandonment of the municipal plant project be divorced from bribery. All men, and I would include appellees, are presumed *to have intended* to bring about the natural and probable results of their own deliberate acts.

In the majority opinion is what might appear to be a suggestion or reason why appellees should not be adjudged to be ineligible to these offices. The suggestion is: ''If the contention of appellants is to be sustained and appellees are to be disqualified on account of being candidates upon a ticket opposed to the principle of municipal ownership, the result of necessity must be that the offer made by the light and power company to the city council and to their customers precluded all possibility that any group of candidates could have run in 1937 on a platform opposed to municipal ownership.'' Had this quotation said that if appellants' contention is to be sustained *without any showing that appellees concurred in and became parties to the bribery,* that then there would follow the conclusion set out in the quotation, the quotation probably would have reflected more correctly the thought intended. So viewed there is nothing in the quotation that in any way sustains the holding of the majority respecting appellees' eligibility, if they acquiesced and became parties to the bribery. But if the all inclusiveness of the pronouncement was intended, it becomes necessary to point out that one of appellants' contentions was that appellees by their conduct became parties to the bribery. Surely, if this contention were sustained, it could not be said that ''the result of necessity must be that the offer made by the light and power company * * * precluded all possibility that any group of candidates could have run in 1937 on a platform opposed to municipal ownership.''

In the majority opinion is set out appellees' platform. It appears to merit at least some discussion. It contained a pledge

to regulate this light and power company in a described manner. This manner was to be "so that essential services may be supplied to the consumers at minimum cost *now*", and so that future profits will be shared among the rate payers, tax payers and owners. (Italics supplied.) In this pledge "now" is emphatically expressed. The phrasing indicates emphasis was intentional. "Now" would not easily be confused with the future, distinguished as it is from "now" by express allusion. If so emphatic a pledge of minimum cost *"now"* were held out under ordinary circumstances there would naturally arise in the voter's mind the query how it could be done, the pledge fulfilled. And under ordinary circumstances the voter would not know how it could be done except by an official reduction of rates. But appellees' pledge was given out to be considered in the light of facts and conditions that were far from ordinary. Eighteen months previously, and each month thereafter, the light and power company had represented to electricity users that it had voluntarily reduced rates to a minimum, to a point that was not even compensatory. The only condition attached was abandonment of the municipal plant project. A part of the proposition was that this rate would be effective from and after the beginning of the 18 month period, and that so-called refunds, that constituted the $72,000, would be paid, upon the condition being met. This "voluntary reduction" of rates to an alleged minimum, and its acceptability, were matters of outstanding controversy around which this turmoil was raging. It was one of the things uppermost in the minds of the voters. It would be naive indeed to assume that minimum cost now, in appellees' pledge, did not refer to this feature of the controversy, that was apparently so determinative of the outcome. Clearly there was no room for conjecture, in the voters' minds, as to how "minimum cost now" was to be accomplished. To them "minimum cost now" and the minimum rate proposal of the company were synonymous. If so, appellees' pledge was an espousal of the proposition of the light and power company, an essential part and parcel of which was payment of the bribes, termed refunds in the proposal. In these covert terms, yet effectively the appellees thus concurred in the bribery, and in effect, not only as earlier in this opinion shown, but additionally and definitely in putting out this pledge, became parties thereto within what must have been the intention of the legislature when it enacted section 981, Code 1935. I

would reverse the decree of the trial court and would direct that court to enter a decree sustaining appellants' contest of appellees' election.