## Allen v. Griffith.

(Decided October 27, 1914.)

### Appeal from Breathitt Circuit Court.

1. Elections—Contest—Ballots Voted Openly.—Ballots voted openly on the table by voters who are not sworn as to their disability are illegal and cannot be counted; and where the number is small and it is reasonably certain for whom they were cast, the election should be purged of such illegal votes without throwing out the entire precinct, but where the irregularities are so widespread and far-reaching as to leave the mind in doubt as to how the election did go, they cannot be eliminated.

2. Elections—Contest—Fraud—Irregularities—Evidence.—In an election contest, held that the fraud, illegality and irregularities were so widespread that it could not be determined with any reasonable certainty which party was elected, and that the election should be declared void.

3. Elections—Disability of Elector—How Ballot Should Be Voted— Section 1475, Kentucky Statutes.—Officers of election are not authorized by Section 1475, Kentucky Statutes, to mark the ballot of an elector unless the elector is blind or so physically disabled as to be unable to mark his ballot, and shall so declare on oath; where the elector states on oath that by reason of inability to read he is unable to mark his ballot, the clerk may make a pencil dot opposite the declared choice of candidates, and the elector shall be instructed to retire to the booth and mark the ballot.

CHESTER GOURLEY and HAZELRIGG & HAZELRIGG for appellant.

BACH & BACH and O'REAR & WILLIAMS for appellee.

OPINION OF THE COURT BY WILLIAM ROGERS CLAY, COMMISSIONER—Reversing.

At the regular election held in 1913 in the county of Breathitt, appellant, A. A. Allen, was the Democratic candidate, and appellee, John C. Griffith, the Republican candidate, for the office of jailer. On the face of the returns appellee received a majority of 100 votes, and was awarded the certificate of election. In due time appellant filed this proceeding contesting the election. He asked that a certificate of election be awarded to him or that the election be declared void. The trial court adjudged that he was not entitled to the relief asked for, and dismissed the petition. From that judgment this appeal is prosecuted.

Appellant sets up grounds of contest in seven precincts, viz: Crockettsville Precinct No. 8, Jackson Precinct No. 2, Frozen Precinct No. 4, Elkatawa Precinct No. 3, Terry Precinct No. 6, Beech Grove Precinct No. 7 and Oakdale Precinct No. 5. Appellee denied the grounds of contest set up by appellant, and alleged counter-grounds of contest as to Buckhorn Precinct No. 11, Georges Branch Precinct No. 9, South Fork Precinct No. 17, Spring Fork Precinct No. 12, Lost Creek Precinct No. 10, Elliottsville Precinct No. 13 and Quicksand Precinct No. 16. Appellee, however, afterwards abandoned his counter-grounds of contest as to all the foregoing precincts except Buckhorn Precinct No. 11, Lost Creek Precinct No. 10 and South Fork Precinct No. 17.

The evidence shows that in Crockettsville Precinct No. 8, which gave appellee a majority of 95 votes, a dispute arose early in the afternoon as to the right of a certain voter to vote. The voter was sworn, and three of the officers concluded that he had a right to vote, while Robin Turner, the sheriff of election, refused to let him vote. Several witnesses say that Robin Turner was intoxicated, as was also another officer of election. Robin Turner was a partisan of appellee. Robin Turner struck Walter Deaton, the Democratic Judge, on the back. About that time some one threw a rock through the window. A little later some one else threw something through the window which struck Walter Deaton on the hand. Just then two or three parties at the window yelled to Deaton to come on or they would kill him. Deaton, fearing for his life, took his saddle pockets and went out the window. Some of the parties are also shown to have had their pistols out. After Deaton left another officer was put in his place. Later on the ballot box was prized open for the purpose of counting the votes. Those who counted the votes say that they were counted correctly. According to appellant's evidence, from 90 to 125 votes were voted openly on the table for appellee, without the voters making oath to their disability. Only one person was sworn during the day, and that was the young man over whose vote the dispute arose. According to appellee's evidence, there was a large number of votes so cast, but the number was not quite as large as stated by appellant's witnesses. Appellee's witnesses also state Deaton was in no danger, and that he left because the election was not going his way.

In Jackson Precinct No. 2, which gave appellee a ma-

jority of 24 votes, there were no booths, but the officers of election stretched a piece of carpet across one corner of the voting place, which was a small boxed house. Some of the partisans of appellee tore a plank off the corner of the house, which enabled the voters to expose their votes. The election officers put a sheet across this opening so that the voters might vote secretly. The sheet was taken down and torn to shreds. When a voter would go in to vote he would go to the crack and hold up the ballot. The partisans of appellee would say ''That is all right. Put it under the log cabin. Double it up and come out here.'' There is no denial of these facts. They are practically admitted by witnesses for appellee, who also say that certain Democrats were present and watching the ballots as they were shown through the crack. This method of voting continued until all the ballots were cast, with the exception perhaps of 20. Then the voting place was moved to another part of the room. Those who were watching the voters vote would sometimes say ''We bought that fellow and we want to see how he votes.'' It is also shown that from ten to fifteen voters voted openly on the table without being sworn as to their disability.

In Elkatawa Precinct No. 3 appellant's evidence is to the effect that one man came into the booth after the poles were closed, and acted as Republican inspector, although the regular Republican inspector was present. On arriving he announced that he was a rapid fire mathematician, and could count the votes in a little while. He took charge of the count, and other supporters of appellee Griffith would frequently distract the attention of Flint Miller, the Democratic sheriff of election, by having him called out of the voting place and telling him that his child was sick and about to die.. This happened several times. In making the tally the inspector would frequently tally for appellant and the other Democratic candidates by making a tally in the same pencil mark three or four times. In counting the vote he would frequently count appellant's vote for appellee Griffith, and when his attention was called to the error he would say ''I will pay it back next time.'' Sometimes he would pay it back and sometimes he wouldn't.

In Oakdale Precinct No. 5 there was some testimony of bribery.

In addition to showing the foregoing facts, plaintiff alleged that in Precincts Nos. 2, 3, 4, 5, 6 and 7, the of-

ficers of election had falsely certified certain majorities in favor of appellee, and asked a recount of these precincts, after offering evidence that the ballots and ballot boxes had been properly preserved.

As counter-grounds for contest appellee charged that 100 illegal votes were cast for appellant in South Fork Precinct No. 17. There was some proof conducing to show that several non-residents were permitted to vote, but the record does not show for whom they voted.

In Lost Creek Precinct No. 10 it is shown that 15 persons voted openly on the table for appellant, without being sworn as to their disability.

In Blackburn Precinct No. 11 appellee's evidence shows that 72 voters voted openly on the table for appellant, without having been sworn, and his witnesses give the names of 60 of such voters. There is further evidence to the effect that in this precinct no booths were provided for the voters. It is shown, however, that the voters went to the end of the room to vote, but it does not appear that they exposed their ballots while voting.

Here we have a case where, in addition to the violence shown in Crockettsville Precinct No. 8, from 90 to 125 persons voted openly on the table without being sworn as to their disability. In Jackson Precinct No. 2, a very large percentage of the 125 voters who voted before the voting place was changed exposed their ballots to outside parties. Several also voted on the table without being sworn. In Elkatawa Precinct No. 3 there was fraud in the count of the ballots, though to what extent does not exactly appear. In Lost Creek No. 10, 15 voters who had not been sworn were permitted to vote openly on the table. In Buckhorn Precinct No. 11 there were from 60 to 75 ballots voted openly on the table, and none of the voters were sworn as to their disability.

It is well settled that ballots voted openly on the table by voters who are not sworn as to their disability are illegal and can not be counted. It is also the rule to purge the election of such illegal votes where the number is small and it is reasonably certain for whom they were cast, and not to throw out the entire precinct. In this case, however, the number of illegal votes cast on each side is so large, and there is such uncertainty as to the precise number and as to the persons for whom cast, that we can not say with any reasonable certainty that either appellant or appellee was elected It may be that in the early operation of the secret ballot there was some

confusion as to the proper method of voting, but the law has now been in force so many years, and its provisions are so well known at this time, it may be doubted if the wholesale voting on the table, such as was practiced in several of the precincts involved in this contest, can be attributed to mere ignorance on the part of the election officers. But whether done intentionally or through ignorance, far more than enough votes to affect the result were cast as if the election were *viva voce* instead of by secret ballot as demanded by the Constitution. In other words, the election in several precincts was conducted in open violation of the law. This is not a case of mere irregularities which are not shown to be prejudicial, and may, therefore, be disregarded. It is a case where the irregularities were so widespread and far reaching as to leave the mind in doubt as to how the election did go, and for that reason they can not be eliminated. Had such voters been permitted to vote properly, the result may have been different. They may have been influenced by the very fact that it was clearly known for whom they were voting, and in thus being permitted or required to vote, they were practically disfranchised. Such an election is not the result of the popular will. The fraud, illegality and irregularities being such as to affect the result and so widespread that we can not tell with any reasonable certainty whether appellant or appellee was elected, we conclude that the election should be declared void. Harrison v. Stroud, 33 Ky. L. R., 653, 110 S. W., 828; Scholl v. Bell, 125 Ky., 750, 102 S. W., 248.

This conclusion makes it unnecessary for us to pass on the propriety of the trial court's action in refusing to open certain ballot boxes to recount the ballots.

For the purpose of emphasizing the provisions of section 1475, Kentucky Statutes, with reference to the manner of voting by illiterate, blind or disabled persons, we deem it proper in this connection to call attention to the fact that neither the clerk of election nor any other officer has authority to mark the ballot of the election unless the elector is blind or so physically disabled as to be unable to mark his ballot, and shall so declare on oath, in which event it must be done by the clerk alone. Where the elector simply declares on oath that by reason of inability to read the English language he is unable to mark his ballot, he may then declare his choice of candidates or party tickets to the clerk. It is then the duty of the clerk, in the presence of the other election officers, to make a

pencil dot in the proper place for the cross mark, to indicate the choice of the elector.  The ballot is then given to the elector, who retires to the booth and marks it by making a cross mark either in the place showing the dots or any other squares he may desire.  Under such circumstances neither the clerk nor any other officer of election has the right to mark the ballot for the elector.

Judgment reversed and cause remanded, with directions to enter a judgment setting aside the election in question.