Lawrence WELLS, Appellant,

v.

Wister WALLACE, Appellee.

Wister WALLACE, Cross-Appellant,

v.

Lawrence WELLS, Cross-Appellee.

Dallas HOLLAND, Appellant,

v.

J. C. WILSON, Appellee.

J. C. WILSON, Cross-Appellant,

v.

Dallas HOLLAND, Cross-Appellee.

Court of Appeals of Kentucky.

Oct. 2, 1959.

STEWART, Judge.

Paul R. Huddleston, Duncan & Huddleston, Bowling Green, for Lawrence Wells and Dallas Holland.

Robert M. Coleman, Coleman, Harlin & Orendorf, Bowling Green, Morris Butler, Greensburg, Robert L. Dowell, Edmonton, for Wister Wallace and J. C. Wilson.

These appeals and cross-appeals are from judgments declaring the general election of November 5, 1957, a nullity in the contests for county judge and coroner of Metcalfe County. Final returns certified by the election commissioners were divided among the candidates as follows, the Republican being denoted by "R" and the Democrat by "D":

|  | County Judge | | Coroner | |
|---|---|---|---|---|
|  | Wells (R) | Wallace (D) | Holland (R) | Wilson (D) |
| Poll votes | 2,118 | 2,073 | 1,846 | 1,775 |
| Absentee ballots | 90 | 227 | 69 | 232 |
| Totals | 2,208 | 2,300 | 1,915 | 2,007 |

The Republicans, Lawrence Wells and Dallas Holland, candidates for county judge and coroner, respectively, contestants herein, filed separate complaints with identical pleadings which alleged, in substance, that certain persons named therein, constituting more than 80% of the absentee voters, were disqualified to vote in Metcalfe County, that all absentee ballots cast were unlawful for failure of the officers and voters to comply with certain requirements of KRS Chapter 126, and that several hundred named individuals voted illegally for the Democratic candidates for county judge and coroner in the seventeen precinct polling places. The prayer of their complaint, as amended, in brief, was (1) that all absentee voter ballots be held void and of no effect; (2) that certain votes allegedly cast and counted at certain precincts be deducted from the two Democratic candidates for reasons shown hereinafter; and (3) that the court declare Wells and Holland to have been duly elected.

The Democrats, Wister Wallace and J. C. Wilson, the candidates for county judge and coroner, in the order mentioned, counterclaimed in each action with lists of several hundred persons who were alleged to have cast illegal votes for the Republican opponent of each of them in all the precincts. Their pleadings asked (1) that the complaints be dismissed; (2) that all of the unlawful votes cast at the polls and counted for the contestant of each of them be held for naught and deducted from his total, and (3) that the court declare Wallace to have been the duly elected county judge and Wilson to have been chosen the regularly elected coroner of Metcalfe County.

There were 499 approved applications for absentee ballots received. Three hundred and twenty-seven absentee ballots were counted by the election commissioners in the various county races, while 83 were rejected for various reasons and 89 were not found and presumably were never returned by the voters. Ten of the absentee ballots in the county judge's race and 26 in the coroner's were not marked. The trial judge, after hearing many witnesses testify, determined that 273 individuals were ineligible to vote by absentee ballots. He stated in his opinion that considerable evidence had been introduced by Wells and Holland, most of which stood unchallenged by any proof offered by Wallace and Wilson, and all of which established to his sat-

isfaction that these individuals lacked residential qualifications entitling them to vote in Metcalfe County. Of this number 14 had been previously rejected by the election commissioners, so that a total of 259 votes by absentee ballot were adjudged to have been cast illegally in the last general election of county officials.

No effort was made by either side to produce testimony as to how the absentee voters cast their ballots, so that no deduction could be made as to which candidate received any particular absentee ballot. To the contention of Wells and Holland that what is known as the 20% rule should apply to the absentee ballots under discussion, the trial judge did not believe such a rule could be invoked because of certain expressions of this Court contained in Gross v. Helton, Ky., 267 S.W.2d 67. The argument advanced in the briefs of the attorneys on both sides seems to be that the scope of application of the so-called 20% rule is that the vote of an entire precinct, or all of the ballots cast by the absentee voters, will be thrown out when as much as 20% of the total vote, in either of these instances or both, is shown to be illegal.

■ We have many times said this rule is not so broad. We redefined what is denominated as the 20% rule in the recent case of Napier v. Noplis, Ky., 318 S.W.2d 875, 879, saying: "The gist of the so-called 20% rule then is that, where there are illegal votes cast in an election (as distinguished from [votes tainted by] fraud or impropriety in the conduct of an election), and it is impossible to determine for whom the votes were cast, the courts will not invalidate the election unless the amount of illegal votes is so substantial that the courts are warranted in concluding that there was not a fair election."

The trial judge pointed out that in the Helton case, although more than 20% of the absentee ballots received were held to be illegal, a sort of formula was resorted to in the disposition of these rejected votes because no proof existed as to how these unlawful votes were cast. That case held that if a contestant of an election fails to prove for whom the illegal votes were cast, he may have deducted from his opponent only such number of the illegal ballots as exceeds the total vote cast for the contestant in the particular precinct. It is noted in the Helton case that in one precinct only three legal votes were cast, and this Court required the litigant challenging the votes to concede that the three legal votes were against his side of the issue.

In the opinion handed down by the trial judge, this statement appears concerning the disqualified absentee voters: "The contestants urge upon the court the proposition that the 20% rule should apply to the absentee voters, despite the previous expressions of the Court of Appeals as to its inapplicability 'when it is possible to determine how the illegal votes were cast'. This argument is pitched on the very persuasive ground that the practical difficulties in taking the depositions of approximately 500 widely scattered voters amount to 'impossibility'. While we have found no case so stating, it appears to the court that these practical matters must indeed be tantamount to 'impossibility', and the court feels that it would be unjustly harsh to impose on contestants the burden of showing by affirmative proof how each of the illegal absentees voted."

When we come to a consideration of the votes cast at the polls, Wells and Holland alleged in their complaints that 816 ineligible voters were permitted to cast their ballots. They claim that out of this number the testimony established 236 illegal votes were cast in the race for county judge, of which 126 were chargeable to Wells and 110 to Wallace, leaving Wells with a majority of 29. They contend 202 illegal votes were cast in the race for coroner, of which 111 were chargeable to Holland and 91 to Wilson, leaving Holland with a majority of 51. Those majorities are of course based upon the assumption that all the absentee ballots cast in those two races are

declared to be void and therefore will be omitted in tabulating the total in each race.

Wallace and Wilson maintain that, allowing for some duplications, roughly 920 voters were challenged out of the total of 4,191 ballots counted in the county judge's race and 3,621 tallied in the coroner's. They advance voting results at variance from those relied on by Wells and Holland. Specifically they urge that five precincts named in the record be disregarded because, they argue more than 20% of the votes cast in each of these voting units were cast by persons who were not residents therein and therefore were disqualified voters. Without going into detail as to their contentions their count claims Wells received 158 illegal votes as coroner and Wallace 105 such votes in the county judge's race. The brief of Wallace and Wilson does not give us their view as to which candidate for coroner received the higher number of legal votes. Apparently they adopt the trial judge's computation in this race, which would give Wilson a majority of 27 votes under certain conditions we need not dwell upon.

The trial judge made a careful study of the evidence in this case, which consisted of 16 volumes and 1,762 pages of transcript, amplified by charts and numerous exhibits. We quote this excerpt from his opinion as regards the votes at the polls: "This record reflects, and it is personally known to the court, that strenuous efforts were made by both sides to bring witnesses before the court to testify as to how they cast their votes. There were more than 250 witnesses who actually did testify. However, despite the fact that forthwith attachments were issued for many witnesses, and special deputies worked diligently to serve process, a substantial number of witnesses were never brought before the court. Of the witnesses who did appear, and from whom evidence could be elicited as to how they voted, the court finds that 104 illegal votes are properly chargeable to Wallace and 143 are properly chargeable to Wells; 85 are prop-

erly chargeable to Wilson and 129 are properly chargeable to Holland. * * * Yet, it is apparent that the number of illegal voters who successfully evaded process was so great as to leave the matter of determining who really won a mere conjecture."

The trial judge's conclusion may thus be summarized: "If it is proper to accord contestants the benefit of the doubt on the showing that practical difficulties made it impossible to truly purge the illegal absentee votes, it is equally proper to recognize the practical difficulties in learning the true situation with regard to the poll voters."

Our review of the evidence in these actions causes us to determine that the trial judge correctly held it was a practical impossibility to determine for whom the greater number of illegal votes, both poll and absentee, were cast. For this reason, we are of the opinion that the entire election in the races under consideration must be declared a nullity. The salutary policy of this Court is to uphold an election if it can reasonably ascertain the true intent of the legal electorate. However, it is equally contrary to orderly judicial process to indulge in mere speculation in an effort to guess which candidate received the majority of legal votes.

According to KRS 122.080(4) the courts "may adjudge that there has been no election" only "if it appears from an inspection of the whole record that there has been such fraud, intimidation, bribery or violence in the conduct of the election that neither contestant nor contestee can be adjudged to have been fairly elected * * *." In Harrison v. Stroud, 129 Ky. 193, 110 S.W. 828, approximately 20% of the voters were allowed to vote openly, instead of by secret ballot, as required by the Constitution of Kentucky and the statutes, and this Court for this reason voided the election there. This was done upon the theory that such a large percentage of the vote was so patently illegal it could be concluded the conduct of the election was

tainted with fraud and that the election should be set aside.

■ In the case at bar there was no showing of intentional fraud, nor was there any intimidation, bribery, or violence proven in the conduct of the election, nevertheless, since the illegal votes secretly cast were so substantial in number and since it cannot be determined for whom they were cast, the election affecting the county judge's and coroner's races is held void under the authority of Harrison v. Stroud, supra. See also Muncy v. Duff, 194 Ky. 303, 239 S.W. 49; Butler v. Roberson, 158 Ky. 101, 164 S.W. 340; Adkins v. Phipps, 159 Ky. 349, 167 S.W. 134; and Allen v. Griffith, 160 Ky. 528, 169 S.W. 1003.

Wherefore, the judgment is affirmed on the appeals and cross-appeals.