Jack SIMS, Appellant,

v.

Harold ATWELL and Jimmy McCoy, George Lang, Conroy Harris and G. A. (Slim) Shelton as members of the Hart County Board of Elections, Appellees.

Harold ATWELL, Cross-Appellant,

v.

Jack SIMS and Jimmy McCoy, George Lang, Conroy Harris and G. A. (Slim) Shelton as members of the Hart County Board of Elections, Cross-Appellees.

Court of Appeals of Kentucky.

Oct. 14, 1977.

Davis Williams, Munfordville, for appellant, Jack Sims.

Joseph R. Huddleston, Bowling Green, Marion Vance, Glasgow, for appellee, Harold Atwell.

George E. Lang, Munfordville, for appellees, Hart County Board of Elections.

Before COOPER, GANT and PARK, JJ.

PARK, Judge.

This is an election contest arising out of the Democratic primary for county judge-executive of Hart County conducted on May 24, 1977. As certified by the board of elections, the contestee-appellant, Jack Sims, was the apparent winner by a plurality of forty-five votes, based upon the following tabulation:

| Jack Sims | 1626 |
|---|---|
| Harold Atwell | 1581 |
| Eursie L. Sullivan | 384 |

The contestant-appellee, Harold Atwell, instituted an election contest proceeding in the Hart Circuit Court challenging all of the votes in Euclid precinct (A–103). As tabulated by the board of elections, the following votes were cast in Euclid precinct:

| Jack Sims | 84 |
|---|---|
| Harold Atwell | 37 |
| Eursie L. Sullivan | 14 |

Thus, if the votes in Euclid precinct were all eliminated, Atwell would be the winner by a plurality of two votes.

The case was tried before the circuit court by deposition as permitted by KRS 120.065. In an Order, Opinion and Judgment entered September 9, 1977, the trial judge held that all of the votes cast in Euclid precinct should be disregarded. On the basis of the vote in the remaining sixteen precincts and the absentee ballots, Atwell was declared the winner by a plurality of two votes. Each party was directed to pay his own costs. Because the case was tried by deposition, the costs were substantial. Sims appeals from that portion of the judgment declaring Atwell to be the Democratic nominee for county judge-executive. Atwell cross-appeals from that portion of the judgment relating to costs.

Throughout the proceedings, Atwell has contended that the irregularities in the conduct of the election in the Euclid precinct were of such magnitude as to justify disregarding all of the votes cast in that precinct. Atwell relies primarily upon the decision in *Upton v. Knuckles*, Ky., 470 S.W.2d 822 (1971). Sims has conceded that

there were illegal votes cast in the Euclid precinct, but he asserts that Atwell has failed to prove that the illegal votes were cast for Sims. Because of this failure of proof, Sims asserts that all of the illegal votes in the Euclid precinct should be charged against Atwell. He cites *Watts v. Fugate*, Ky., 442 S.W.2d 569 (1969). Although the paramount issue relates to violations of the secret ballot, there are numerous other irregularities which must be considered in determining whether the vote in Euclid precinct should be disregarded.

## GENERAL CONDUCT OF ELECTION

■ Pursuant to KRS 117.045(1), the county board of elections appointed the following precinct election officers: Willie McCoy, Judge (Democrat); Lawrence Bacon, Judge (Republican); James Wood, Clerk (Democrat); and Mable Bratcher, Sheriff (Republican). James Wood did not serve as precinct clerk at the May primary election. Betty Horton was appointed by McCoy to act in Wood's place as the Democratic clerk of the election. As he was the only duly appointed Democratic election officer present at the Euclid precinct on the day of the election, McCoy apparently was acting under the authority of KRS 117.-045(3) when he selected Betty Horton to act as the Democratic clerk.

Atwell attacks the appointment of Betty Horton on two grounds. First, Atwell relies upon the testimony of Wood that, several days before the election, he informed McCoy that he would be unable to serve as clerk. McCoy testified that Wood stated only that he might not be able to serve. According to McCoy, he asked Betty Horton to be available to serve as an election officer in the event that Wood did not come to the polls on election day. The trial judge made no findings of fact with respect to this issue. The record is clear that the county board of elections was not informed by anyone of Wood's intention not to serve so that the vacancy could be filled by the board of elections pursuant to KRS 117.-045(2).

Even more important than the method of her appointment is the fact that Betty Horton was a registered Republican. However, the record also establishes that Mrs. Horton had been a registered Democrat until 1973 until she switched registration to assist a Republican candidate. At the time of the election in question, she was on the Democratic party executive committee by virtue of being Democratic chairwoman for Euclid precinct. On one prior occasion she had served as an election officer.

Betty Horton was not lawfully qualified to serve as the Democratic clerk at the primary election May 24, 1977, at the Euclid precinct. Nevertheless, the defect in her appointment should not disfranchise all of the voters in the Euclid precinct. *Burchell v. Smith*, Ky., 262 S.W.2d 365 (1953); *Harmon v. Wilson*, Ky., 254 S.W.2d 693 (1953). Atwell cites no authority for the proposition that the vote of an entire precinct will be disregarded merely because one of the persons serving as an election official was not properly qualified. In view of McCoy's authority under KRS 117.045(3) to fill a vacancy in the office of Democratic clerk, Betty Horton was, at the very least, a de facto officer. *Schaffield v. Hebel*, 301 Ky. 358, 192 S.W.2d 84 (1946). Consequently, the election at Euclid precinct will not be invalidated merely because of the irregularity in the appointment of Betty Horton as the Democratic clerk of election.

■ None of the election officers at the Euclid precinct took an oath of office. Atwell cites no statute requiring an oath for precinct election officers. KRS 116.120 formerly required an oath, but it has been repealed. 1972 Ky. Acts, Ch. 188, § 69. Assuming that an oath were required by Section 228 of the Kentucky Constitution or the general statute relating to oaths, KRS 62.010, the failure of the precinct election officers to take an oath does not invalidate the election in that precinct. *Hodges v. Hodges*, Ky., 314 S.W.2d 208 (1958).

The election in Euclid precinct was conducted in a small storeroom attached to a grocery in the Kessinger community. Although the evidence is conflicting, the great

weight of the evidence indicates that McCoy spent most of the day on the front porch of the store. The trial judge made no specific finding on this issue, but did find that a large number of persons were permitted to electioneer "even at the very doors of the voting room." There is also evidence that other election officers were absent for short periods of time during the day. Even if McCoy were absent from the voting room for most of the day, that fact alone would not invalidate the election. *Schaffield v. Hebel, supra.*

■ The record establishes that none of the precinct election officers received the instruction required by KRS 117.185(1). We deem this fact to be immaterial. The statute refers to instruction "in the use of the voting machines." There is no evidence that the precinct officers were presented with any problem in the operation of the voting machine in Euclid precinct at anytime during the election day. The record also establishes that the Hart County Fiscal Court had not authorized electioneering at polling places as provided by KRS 117.235(3). Not only was there electioneering in the vicinity of the polls at the Euclid precinct, but, as the trial judge found, the electioneering occurred up to the very doors of the voting room. However, there was no evidence that the electioneering interfered with the secrecy of the voting or that it in any way affected the outcome of the election at the Euclid precinct. The trial judge specifically found that there was no disorder or intimidation. Under these circumstances, electioneering adjacent to the polls does not justify invalidating all of the votes in the precinct. *Stanley v. Goff*, Ky., 324 S.W.2d 124 (1959).

None of the general objections to the conduct of the election in Euclid precinct would sustain a judgment invalidating all votes cast in that precinct in the election, and the judgment of the trial judge was not based upon those grounds. Nevertheless, the foregoing evidence relating to McCoy's actions on election day and the appointment of Betty Horton is relevant on the question of open voting.

## OPEN VOTING

■ The secret ballot has been a cornerstone of our representative form of government since the adoption of the present Constitution of Kentucky in 1891. Section 147 of the Kentucky Constitution provides:

. . . [A]ll elections by the people shall be by secret official ballot, furnished by public authority to the voters at the polls, and marked by each voter in private at the polls . . . The General Assembly shall pass all necessary laws to enforce this section, and shall provide that persons illiterate, blind, or in any way disabled may have their ballots marked or voted as herein required.

Pursuant to this constitutional mandate, KRS 117.255(2) provides:

No voter shall be permitted to receive any assistance in voting at the polls unless he makes and signs an oath that, by reason of inability to read English, or by reason of blindness or other physical disability he is unable to vote without assistance. Upon making and filing with the judges such oath, the voter shall retire to the voting machine, with the judges, and one (1) of the judges shall then, in the presence of the other and the voter, operate the machine as the voter directs. The disabled person applying to vote may, if he prefers, be assisted by a person of his own choice who is not an election officer. The clerk shall swear the person accompanying the disabled or blind voter to operate the voting machine in accordance with the direction of the disabled or blind voter, and the disabled or blind voter and person sworn shall then enter the voting booth and the one so sworn shall operate the machine for the disabled or blind voter as he directs. No voter shall be assisted under this subsection unless the judges and sheriff of election are satisfied of the truth of the facts stated in the oath. The voter shall state in his oath the specific physical disability that requires him to receive assistance, and the judges of election shall enter in writing, on a record of assisted voters, the voter's

name and the specific physical disability which required him to receive assistance. The record clearly establishes that these procedures enacted to protect the secret ballot were openly flouted by the election officials in Euclid precinct at the primary election of May 24, 1977.

In his findings of fact, the trial judge stated:

The proof shows that KRS 117.255 was the most flagrantly violated election law. Not a single voter signed the required affidavit of disability. Yet, voter after voter was accompanied in the voting booth by a single election officer who either voted or assisted the voter. Many of them appeared to be under no disability. Forty or more such votes were cast among the witnesses from Euclid precinct that testified. All of these votes were illegal.

From our examination of the record in this case, we conclude that there were forty-eight voters who cast their vote with another person present in the voting booth.

Of the forty-eight persons who did not vote by secret ballot, four were accompanied into the voting booth by Mable Bratcher, the Republican sheriff, and four were accompanied by close relatives. Atwell concedes that Mrs. Bratcher and the voters' family members acted in good faith for the purpose of assisting the voters in question. Nevertheless, Mrs. Bratcher acknowledged that she knew that a judge from each party should go into the booth with any voter needing assistance.

With respect to Willie McCoy and Betty Horton, the evidence of impropriety is even stronger. McCoy accompanied nine voters into the booth, and Mrs. Horton accompanied thirty-one voters. On many if not most occasions, McCoy and Horton accompanied the voter into the booth without any prior request for assistance. McCoy and Horton observed how the vote was cast in each instance. In many instances, McCoy or Horton actually cast the vote by pulling the levers. Because McCoy and Horton were alone in the booth with many voters who were illiterate or unable to see, there

was no way to determine whether they in fact voted the wishes of the voter. Some voters complained that McCoy or Horton voted for them when they were perfectly capable of voting themselves. On one occasion, McCoy questioned a voter why she wanted to vote for Atwell. Three of the persons "voted" by Betty Horton received three or four dollars in cash after they left the building in which the election was conducted.

The action of McCoy and Horton was not based on ignorance. McCoy had served as an election official for many years, and on two occasions he had served as county judge of Hart County. He personally selected Betty Horton to serve as the other Democratic precinct officer. With McCoy stationed outside the door to the polls and Horton accompanying voters into the voting booth, there was good reason for Atwell to suspect that the arrangement was intended to insure that persons voted as they were paid to vote. The evidence does not establish that this actually occurred, but the potential for fraud by such an arrangement is awesome.

The practice of open voting without the execution of an affidavit of disability was condemned more than sixty years ago in *Allen v. Griffith,* 160 Ky. 528, 169 S.W. 1003 (1914).

It is well settled that ballots voted openly on the table by voters who are not sworn as to their disability are illegal and cannot be counted. . . . It may be that in the early operation of the secret ballot there was some confusion as to the proper method of voting; but the law has now been in force so many years, and its provisions are so well known at this time, it may be doubted if the wholesale voting on the table, such as was practiced in several of the precincts involved in this contest, can be attributed to mere ignorance on the part of the election officers.

169 S.W. at 1005. Over fifty years ago in *Marilla v. Ratterman,* 209 Ky. 409, 273 S.W. 69 (1925), the court again condemned the illegal assistance of voters in the following language:

. . . The laws relating to voting by secret ballot having been on the statute books for 30 or more years it is difficult to conceive that persons acting as officers of election and voters would so persistently and completely violate and disregard these laws, without being moved thereto by an illegal purpose. At this time, in our history, there can be no excuse for such pretended elections, and the sooner those who conduct elections become fully aware of this fact, it will redound to their interest, as well as all others.

273 S.W. at 75. The specific practice involved in this case was condemned in *Mills v. Broughton*, Ky., 365 S.W.2d 315 (1962). In that case, fifty percent of the voters in a precinct were aided by the judges in voting on the voting machine, and none of the assisted voters made the oath then required by statute. The court held that the making of the oath of disability was mandatory, and that there had been a violation of the secrecy of the ballot required by section 147 of the Kentucky Constitution. At this point in time, the open voting in Euclid precinct is inexcusable.

Sims suggests that the actions of the precinct election officers were not intended to benefit either candidate. Even if this were true, the absence of an express intent to benefit a specific candidate does not detract from the wrong done to the voters themselves. In discussing open voting in *Harrison v. Stroud*, 129 Ky. 193, 110 S.W. 828, 33 K.L.R. 653, 16 Ann.Cas. 1050 (1908), the court stated:

. . . In the case at bar all who were permitted to vote openly, as it is called, had not a bad purpose. They intended to vote. They had the legal right to vote. They attempted to exercise that right. They were misled by the officers of election so that their suffrage in this instance was destroyed.

110 S.W. at 830. In discussing what constituted fraud in an election contest, this court recently adopted the following definition from *Black's Law Dictionary*:

FRAUD—An intentional perversion of truth for the purpose of inducing another in reliance upon it to part with some valuable thing belonging to him or to surrender a legal right. . . .

*Kirby v. Wood*, Ky.App., 558 S.W.2d 180 (1977).

By their actions, the election officers in Euclid precinct led numerous voters to believe that they could legally receive "assistance" without executing the statutory affidavit and that a single election officer could accompany the voter into the booth. Because of the action of the precinct election officers, the votes cast by these voters were illegal. We have no hesitancy in declaring that a fraud was practiced upon the voters who were led to believe that they could cast a legal vote without complying with the requirements of KRS 117.255(2).

OTHER ILLEGAL VOTES

Atwell asserts that there were votes that were illegal for reasons other than open voting. In many cases a vote was illegal for more than one reason. For example, a convicted felon awaiting transportation to the Kentucky State Reformatory was permitted to vote. As he received assistance in voting, his vote has already been calculated in determining the number of illegal open votes. When all of the duplications are eliminated, we find from the evidence that there are ten additional illegal votes.

■ Four voters failed to sign the precinct list as required by KRS 117.225. This statute is mandatory. The signing of the precinct list is a pre-requisite to the right of a voter to cast a ballot. *Gross v. Helton*, Ky., 267 S.W.2d 67 (1954). In this case, the failure to sign the precinct list was not widespread. In each instance, the voter's name was signed on the precinct list by a relative, election officer or other unknown person. However, it is clear that each voter in question actually voted in the election. This is not a case in which a third person used a legal voter's name to cast an illegal vote and refused to sign the precinct list in order to escape detection. We find no fraud with respect to the four voters who did not sign the precinct list.

■ The evidence establishes that five persons who were not residents of Euclid precinct voted illegally. *Gambrell v. Parker,* Ky., 261 S.W.2d 447 (1953); KRS 116.025; KRS 116.055(1). However, the evidence in the record also establishes that each of the five voters was, in fact, a bona fide resident of Hart County who would have been entitled to vote in the primary election for county judge-executive if he or she had requested a transfer of registration pursuant to KRS 116.085(1). Although illegal, these votes are not tainted with fraud.

■ The remaining illegal vote cast at the Euclid precinct was the vote of Betty Horton. Because she was a registered Republican, she was not entitled to vote in the Democratic primary for county judge-executive. KRS 116.055(1). Betty Horton served as clerk, and she had possession of the precinct list. She was in no position to claim that she did not know that she was a registered Republican. Under these circumstances, her vote should be deemed fraudulent and considered with the forty-eight open votes.

### EFFECT OF ILLEGAL VOTES IN EUCLID PRECINCT ON THE PRIMARY ELECTION RESULTS

One hundred forty-seven persons voted in Euclid precinct during the May 24, 1977, primary election. Of that number, fifty-eight voted illegally. It follows that eighty-nine persons cast their votes at the Euclid precinct without any violation of the election law. In his findings of fact, the trial judge stated it was impossible to determine for whom the illegal voters cast their vote. The trial judge disregarded all of the votes cast in the Euclid precinct because of what he deemed to be "the large percentage of illegal votes cast."

■ Of the one hundred forty-seven persons who voted in Euclid precinct, one hundred twenty-eight testified by deposition. Most of these voters were asked for whom they voted in the primary race for county judge-executive. Those persons who cast legal votes did not have to testify how they voted. *Little v. Alexander,* 258 Ky. 419, 80 S.W.2d 32 (1935) (dictum). When the illegality of a vote is established, the voter may be compelled to state how he cast his illegal vote. *Bentley v. Wright,* 303 Ky. 618, 197 S.W.2d 420 (1946). In the present case, the voters who cast illegal votes were not compelled to state for whom they had voted. Evidence indicates that Sims encouraged some voters to decline to state how they cast their votes. The record also establishes that Atwell's attorney indicated to many voters that they had a right to decline to testify how they voted. An illegal voter may refuse to testify for whom he or she voted only on the grounds that the answer might tend to incriminate. See *Wilkinson v. Queen,* Ky., 269 S.W.2d 223 (1954); *Black v. Spillman,* 185 Ky. 201, 215 S.W. 28 (1919) (dictum). In the present case, neither party moved the trial court for an order pursuant to CR 37.01(2)(A) requiring the illegal voters to disclose for whom they had voted.

The trial judge was correct in finding that it was impossible to determine for whom *all* the illegal voters cast their votes. However, some of the illegal voters did reveal for whom they voted. Consequently, it is possible to determine for whom *some* of the illegal voters cast their votes.

With respect to the forty-eight open votes, the record establishes that fourteen voted for Sims and four voted for Atwell. With respect to the ten other illegal votes, the record reveals that one voted for Atwell and that one voted for the third candidate, Sullivan. These known illegal votes should be deducted from the candidates as follows:

| Sims | Atwell | Sullivan |
|------|--------|----------|
| 1626 | 1581 | 384 |
| 14 | 5 | 1 |
| 1612 | 1576 | 383 |

After deducting the known illegal votes, Sims's plurality is reduced from forty-five votes to thirty-six votes.

Based upon the record in the case, it is not possible to determine for whom the remaining thirty-eight illegal votes were cast. Of that number, thirty-one can be deemed to have been tainted by fraud—the remaining thirty open votes plus the illegal vote of Betty Horton. These thirty-one "fraudulent" votes would not be enough to affect the outcome of the election, even if all were charged against Sims. Consequently, the entire vote in Euclid precinct should not be thrown out solely on the basis of the thirty open votes and the vote of Betty Horton as a registered Republican.

The outcome of the election could be affected only if the remaining seven illegal votes are in some way chargeable to Sims. These votes were untainted by fraud. Three voters failed to sign the precinct list, and four voters resided outside Euclid precinct but within Hart County. Atwell had the burden of proving for whom these votes were cast. *Napier v. Noplis,* Ky., 318 S.W.2d 875 (1958); *Watts v. Fugate, supra.* Having failed to prove for whom the seven votes were cast, Atwell should be charged with those votes. There is no justification for charging these votes against Sims. Consequently, we conclude that the trial judge erred in holding that Atwell was the winner of the election. See *Miller v. Wathen,* Ky., 528 S.W.2d 733 (1975).

We are not required to disregard all of the votes in the Euclid precinct under the authority of *Upton v. Knuckles, supra.* The violations of the election laws were not so flagrant, extensive and corrupt that all of the votes in the Euclid precinct should be deemed void and illegal. Because a substantial majority of the votes cast in the Euclid precinct were untainted by any fraud or illegality (89 out of 147), we would be extremely reluctant to throw out the vote of the entire precinct. To do so would disenfranchise the legal voters because of the illegal acts of the election officials which would not have affected the outcome of the election. We seriously question the validity of a rule which would throw out the entire vote of a precinct even though a significant number of legal votes were cast. When presented with a similar question in *Marilla v. Ratterman, supra,* the court held:

Neither of the contestants was elected because neither did or could demonstrate with a reasonable certainty that he had received a majority of the legal votes. The official returns are presumed to be correct, and if one would overturn them, he must show with reasonable certainty that he was elected. The casting out of the precincts is not a holding that there were no legal votes cast in them, but that it was impossible to separate them from the illegal and that without a total disregard of the votes in these precincts, the contestants would not have any majority.

273 S.W. at 77. If the illegal votes are so numerous that it is impossible, as a practical matter, to determine for whom they were cast so that the election cannot be determined on the basis of the legal votes, the entire election should be declared void rather than the result in a particular precinct. *Wells v. Wallace,* Ky., 337 S.W.2d 18 (1959); *Browning v. Lovett,* 139 Ky. 480, 94 S.W. 661 (1906). We believe that there is much merit to the dissenting opinion in *Upton v. Knuckles,* 470 S.W.2d at 827. Nevertheless, we need not decide when the vote of an entire precinct may be disregarded rather than declaring that there was no valid election. In the present case, the contestant has failed to introduce sufficient evidence to establish that Sims did not receive the Democratic nomination for county judge-executive.

In appeal No. CA–1748–MR, the judgment of the circuit court is reversed with directions to enter a judgment dismissing the contestant's complaint. In the cross-appeal No. CA–1778–MR, the judgment as to costs must be affirmed, because Atwell has not shown that he is entitled to any relief. The mandate shall issue forthwith. KRS 120.075(3).

All concur.