**Patsy JERNIGAN, Appellant,**

v.

**Jessie Pearl CURTIS, Appellee.**

Court of Appeals of Kentucky.

Oct. 28, 1981.

Discretionary Review Denied
Oct. 30, 1981.

James C. Jernigan, Tompkinsville, David L. Williams, Burkesville, for appellant.

Joe L. Travis, Glasgow, for appellee.

## OPINION AND ORDER

Before HOWERTON, McDONALD and WINTERSHEIMER, JJ.

McDONALD, Judge.

This appeal has been taken from a judgment upholding the Republican primary election for the office of circuit court clerk of Monroe County held on May 26, 1981. Patsy Jernigan, a defeated candidate, initiated the contest seeking to set aside the election based upon certain specific illegal votes and extensive violations of the Kentucky voting laws that occurred in two precincts.

In the primary election conducted on May 26, 1981, three candidates contested the Republican nomination for the office of circuit court clerk of Monroe County. The following table sets out the candidates, the total votes they received in the election, and the number of votes that they received in each of the two disputed precincts.

| CANDIDATES | TOTAL VOTES | PRECINCT NO. 1 (Fountain Run) | PRECINCT NO. 6 (West Tompkinsville) |
|---|---|---|---|
| Jessie Pearl Curtis | 1,861 | 153 | 167 |
| Patsy Jernigan | 1,857 | 61 | 158 |
| Melva Jean Headrick | 889 | 12 | 107 |
| | 4,607 | 226 | 432 |

On June 9, 1981, Mrs. Jernigan initiated this election contest challenging the legality of five specifically named voters who cast their votes at the two precincts listed above, and also seeking to have the vote of both of those precincts thrown out because of alleged extensive violations of the election law. The respondent filed a motion to quash the summons and to have the contest dismissed because the summons was not served on her personally by the sheriff within 15 days of the date of the election.

As part of her answer, Curtis filed a counterclaim alleging violations of K.R.S. 121.055 in that certain poll workers had expended money and other things of value directly and indirectly to persons in consideration of the vote of that person.

Extensive evidence was heard by the circuit court which is contained in over 900 pages of transcript in the record. On September 30, 1981, the trial court entered a 73-page resume of evidence, findings of fact, conclusion and judgment. The judgment found two of the specifically named voters to have voted illegally, found that two others had voted legally, and failed to make any finding as to the fifth voter. The judgment found that the contests had been timely initiated. Finally, the judgment found that any violations of the election laws in the precincts named in the petition did not amount to such widespread irregularity that the votes of those precincts should be discarded, and declared Curtis to be the winner of the election.

The issues presented by this appeal are as follows: (1) Whether or not this election contest was timely initiated; (2) whether the voters specifically named in the petition cast their votes illegally; and (3) whether there was such widespread illegal conduct at either the Fountain Run or the West Tompkinsville precincts that the vote of that precinct should be discarded.

1. Whether or not the contest was timely initiated.

The contestee filed a motion to quash the summons and dismiss the appeal on the grounds that the summons had not been delivered to a sheriff or other individual authorized to serve summons within fifteen (15) days.

It is not disputed that the complaint was filed within fifteen days of the date of the primary election and that summons was issued by the clerk and delivered to the contestee by the contestant's attorney on that same day. The statute covering procedure in primary elections provides that the summons may be personally served on the contestee in any county, or it may be served by leaving a copy at his home with a member of his family over sixteen years of age, or by posting a copy on the door of his residence. The statute does not address who may serve a summons in an election case.

It would appear that since the contest was filed and summons issued within the time period required by the statute and since the contestee did receive actual service of the summons, the contestee cannot complain of any technical defect if indeed there was one.

2. Illegal Voting.

*Callie Gillenwater.* The circuit court concluded that the vote of Callie Gillenwater was illegally cast for Mrs. Jessie Pearl Curtis. It cannot be said that this finding was clearly erroneous, and therefore, it cannot be disturbed upon appeal. However, the circuit court was erroneous in adding the vote to Mrs. Jernigan's total

after deducting it from Mrs. Curtis' total. The illegality here was not that Mrs. Gillenwater's vote was cast for someone other than the candidate for whom she wished to vote, but rather was that the vote was openly cast. A vote that is illegally cast cannot be counted. *See Sims v. Atwell*, Ky., 556 S.W.2d 932 (1977).

■ *G. C. Key and Joanne Key.* The Keys testified that they received improper assistance at the Fountain Run precinct, such that their votes were improperly cast for Mrs. Curtis when they intended to vote for Mrs. Jernigan. There was contradictory testimony from the individual who allegedly assisted them and several election officers that the Keys were not assisted in any way at the polls. The lower court found that they were not assisted in any way. There was adequate evidence to support this finding.

■ *Levi Waller and Vera Waller.* Levi Waller and his wife, Vera Waller, voted at the Fountain Run precinct. In the complaint it was alleged that they were not residents of Monroe County and were therefore not entitled to vote at that precinct or in this race. The circuit court found that the Wallers were actual residents of Allen County and should not have been allowed to vote in the Monroe County race. The tax records appeared to have been particularly persuasive. They showed that Mr. Waller paid taxes on the residential part of his property in Allen County and qualified for the homestead exemption in Allen County. There is no reason to disturb the finding that the Wallers are residents of Allen County rather than of Monroe County.

The circuit court found, based on Mr. Waller's testimony, that he had voted for Mrs. Curtis. This vote was properly deducted from Mrs. Curtis' majority.

The circuit court was unable to obtain the testimony of Mrs. Waller, in spite of repeated efforts, and the circuit court made no actual finding as to how she had voted. The circuit court did state that it was sure that if her testimony had been obtained, she would have testified that she voted for Mrs. Curtis. It may be that given her husband's reputation for bringing out the vote in the precinct, and the effort that was expended to avoid having her testify, the circuit judge could have made a finding that she had voted for Mrs. Curtis. However, little would be served by the making of such a finding at this point because of the earlier finding the court made regarding the votes cast by G. C. and Joanne Key.

Deducting the votes of Callie Gillenwater and Levi Waller from Mrs. Curtis' total, leaves her with a total of 1,859 votes. This is still two more than the number of votes received by Mrs. Jernigan. Even if it were determined that Mrs. Waller had cast an illegal vote for Mrs. Curtis, this would still leave Mrs. Curtis with a majority of one vote. Therefore, the result of the election is not altered by the rulings on the illegal votes.

3. Precinct Irregularities.

*West Tompkinsville Precinct.* It is the opinion of this panel of this Court that the circuit judge was extremely gentle in reflecting on the conduct of the election officers in these two precincts. The conduct of this election smacks of almost incredible misfeasance and in one case, at least, deliberate malfeasance.

There were two significant errors alleged in the West Tompkinsville precinct. The first was that there was a discrepancy between the number of votes cast on the machine and the number of voters casting their ballots at the polling place. Second, it was alleged that open voting occurred in the precinct in that assistance was provided to various voters by election officials without the administration of the oath required by statute.

The numbered discrepancy arises in two different fashions. It was admitted by at least one election official that when the polls were closed, the voting machine showed that 531 votes had been cast during the day, but that the clerk's check list of voters voting showed that only 526 voters had voted at that precinct. Rather than turn in such a report, the election officials

wrote in five additional names on the check list to cause the totals to balance. However, there is an additional problem. The name of Eugene Russell appears twice on the check list, at numbers 291 and 346. The name of Mary Goad also appears twice, at numbers 120 and 175. There is only one person with each of those names registered in the precinct. Each of those individuals testified that they had voted only once. Therefore, there is an additional two-vote discrepancy which no one has attempted to explore.

That this should be so is not too surprising. Mr. Condra testified that at one point they sent a Republican into the polling booth when the machine was set up to allow a Democrat to vote. The Republican voter pointed out to the election officials that he was unable to pull levers in his party's primary. To avoid the problem, the election officials cast a vote for one of the Democratic sheriff candidates and then switched the machine to allow the Republican to vote. Mr. Condra testified that he knew that this happened once for sure.

It was testified by several of the election officials that no one was allowed to vote more than once in the precinct. The discrepancy was acknowledged by all of the election officials except a Mr. Goad, who denied the problem existed.

It was also admitted by all of the election officials, with the exception of Mr. Goad, that assistance was provided to various voters without the administration of the statutorily required oath and the completion of the affidavit. Mr. Goad contended that the forms had been completed but then stolen from the table at the precinct. It does not appear from the transcript that anyone took this contention very seriously. It is undisputed that when the election materials were returned to the county clerk, they contained only one partially completed form for a Mr. Fred Adams.

The number of voters who were so assisted is subject to dispute. One election official, Mr. Hagan, testified that three or four people were assisted. He identified Fred Adams and Lee Henry as having received assistance. Mr. Condra also testified that Fred Adams received assistance, and that as many as four people were in the booth at once when the Dyers came in to vote. Four individuals testified that they received assistance to vote in the West Tompkinsville precinct. These were A. Dyer, M. Dyer, R. Humes, and M. Humes. Mr. Goad, an election official, testified that Lee Kingerly had received assistance. The contestant's husband, an attorney, testified that he was present at the precinct when Coomer Tooley voted and that he saw this individual assisted by Mr. Condra. Mr. Tooley was never called to testify; Mr. Condra doesn't remember.

The contestant's husband also testified that in the several hours he was at the precinct during the course of the day he was able to look into the polling place through the door and that on many occasions, he saw four legs under the curtain of the voting booth. That open voting occurred was not disputed by any of the election officials who admitted that it was the normal practice to allow married couples to go into the voting booth together. How frequently this occurred on May 26, 1981, was never even speculated on.

Although the above indicates that the election officials at the West Tompkinsville precinct were either ignorant of their function or didn't care how they performed it, it is our opinion that the circuit judge was not erroneous in refusing to throw out this precinct. The count discrepancy was only shown to be seven votes. Improper assistance was proven in less than ten cases. The instances of improper open voting were not even estimated, and it cannot be assumed that it was substantial. There were over 500 votes cast in this precinct on May 26. It has not been demonstrated that the errors set out above so destroyed the fairness of the election in this precinct that the votes of this precinct should be discarded.

*Fountain Run Precinct.* Fountain Run precinct (Precinct No. 1) is a smaller precinct than No. 6. The clerk's voter check list shows that 291 voters cast their ballots at that precinct on election day. Two hun-

dred and twenty-six (226) votes were cast in this disputed contest. The election officers at the Fountain Run precinct were Brenda Hunt, Eual Hunt, Adrian Lee, and Marguerite Duncan.

There are a variety of errors which should be noted in the conduct of the election in this precinct. Principally it was alleged that open voting was permitted in that assistance was provided to voters without the administration of the necessary oath and the completing of the necessary affidavits and that there was such bribery and corruption in the conduct of the election in the precinct that the election in the precinct was rendered unfair.

The most insignificant problem is that the name of one voter, Roy Lee York, appears twice on the voters' check list at numbers 65 and 166. The precinct clerk, Brenda Hunt, was unable to explain this, although she testified she was sure that Roy Lee York did not vote twice. She testified that she was almost certain that he did not receive any assistance in voting. The voter signature list shows that Roy Lee York signed his name with a mark.

When the polls were opened at Fountain Run, there were only three election officials present. One of the officials who had been chosen to serve on the basis of past service, informed the county clerk shortly before the election that he would not serve. The clerk was unable to get another Democrat from this heavily Republican precinct to serve as an election officer, and it was not until election morning that he secured Adrian Lee from another precinct to serve at Fountain Run. Mr. Lee did not arrive at the polling place until sometime between 10:00 and 11:00 o'clock. Until that time, the election proceeded with, at most, three election officials. During that same time period, Brenda Hunt was also absent from the polling place for brief periods while she attempted to get through to the county clerk to inform him of the missing election official. Her task was complicated by the fact that many phones in the area were inoperative. Thus, for some period of time, there were only two election officials at the poll.

There are some interesting discrepancies in the return sheet for this precinct. First is the fact that Adrian Lee signed the certification as to the settings on the voting machine when the polls were opened. Mr. Lee did not arrive at the polls until sometime between 10:00 and 11:00 a. m. Secondly, the number shown as registering on the protective counter when the polls opened in the morning is the same as that shown on the protective counter when the polls closed. The number of the seal used to seal the machine at 6:00 p. m. is exactly the same as the seal number on the machine when it was opened at 6:00 a. m.

The simple fact is that both certificate No. 1 (for opening the machine) and certificate No. 2 (for closing the machine) were filled out at the same time. This was admitted by the precinct clerk, Brenda Hunt. No one read the protective counter in the morning or noted the number of the seal that was broken to open the machine. It appears that the opening counter number shown in certificate No. 2 was arrived at by subtracting 291 (the number of names on the clerk's check list of voters voting) from the closing reading. While this avoids embarrassing discrepancies such as that which occurred in precinct No. 6, it is clearly improper practice. It prevents the discovery of problems such as Roy York's name appearing twice on the clerk's list. Brenda Hunt also admitted that she alone signed the return sheet. She also wrote in the names of the other precinct election officials.

The above items are individually not significant, but when considered accumulatively with the material that follows, they are pieces of a very sorry picture of the May 26 primary at Fountain Run.

The first major problem is that of open voting. Marguerite Duncan testified that husbands and wives were allowed to enter the polls together. How frequently this happened on May 26 was never speculated on.

There were no voter assistant's affidavits completed at Fountain Run. It is admitted

that assistance was provided. Brenda Hunt testified that some but not many voters were assisted. Her father, Eual Hunt, estimated that he assisted no more than 25 people to vote. Adrian Lee testified that as many as 50 people voted with assistance.

Under Kentucky law, the completion of an affidavit and the administration of an oath is mandatory before a person may be assisted in voting. This was not done at all in Fountain Run on May 26. Usually such failure is due to ignorance on the part of the election officials. This is not the case here. Brenda Hunt, a college graduate and schoolteacher who claimed to have studied the precinct officer's manual and who was aware of the requirement of the law, decided that oaths and affidavits were unnecessary: "Because, I told you, if you can't trust the judges [precinct officers], you shouldn't have the election anyway. That's the way I feel about it." "And I won't the next time . . . ."

The circuit judge split the difference between 3 and 50 and decided that since 27 was 11% of the 291 votes cast in the precinct, it was insufficient to throw out the result in the precinct. It is the law that the 20% rule is irrelevant in determining whether or not to invalidate the vote of a precinct. It would appear that standing alone, the amount of proven open voting would not justify throwing out the result in this precinct. However, the open voting, the technical failures of the election officers and their defiance of the law in providing assistance to voters create an ominous backdrop for the activities of Levi Waller and Bo Tooley.

It should be noted at the outset that this is not a corrupt practices case. The contestant did not seek to disqualify Mrs. Curtis as a candidate because of her participation in bribery. Not one item of evidence was introduced to connect Mrs. Curtis with any corrupt scheme or any wrongdoing. What is alleged is that the corrupt activities of Mrs. Curtis' supporters, together with the misfeasance (and malfeasance) of the election officers, so destroyed the fairness of the election in the Fountain Run precinct

that the result obtained in that precinct must be discarded.

Levi Waller admitted buying votes. How many he purchased is uncertain. He admits spending between $100 and $200. Waller denies going to the bank on election day, but a teller testified that Waller did obtain a supply of $5.00 bills at the bank. This is only one of many lapses of memory on Mr. Waller's part.

This was not Waller's first effort at vote buying. The Tompkinsville police chief, the Fountain Run city clerk, and the contestant's husband (who was qualified as being knowledgeable about Monroe County politics) testified that Waller had a reputation of vote buying in the Fountain Run precinct. The same reputation evidence was offered against Bo Tooley, who also worked the Fountain Run precinct on May 26 on Mrs. Curtis' behalf. Tooley denied any wrongdoing, but at least one voter testified that Tooley offered her $10.00 to vote his way. Tooley's excessive concern with the presence in the area of an individual who was taking pictures appears suggestive. Billie Jo Dunn testified that she witnessed Waller and Tooley bribing voters. Adrian Lee testified that he saw Waller give money to two women.

Waller did go frequently to the precinct clerk to check to see if certain voters were registered. He says that he was checking on the registration of people he didn't know at their request. He is unable to explain why they would request that he check when they were going in anyway, and did not know Waller prior to coming to the poll. The same explanation of Waller's activities was offered by Eual Hunt, an election officer. He was also unable to explain the reason for the procedure.

Mitchell Taylor, a defeated magisterial candidate, testified that Brenda Hunt told him about two weeks before the election that "[t]hey bring the people to the door and have the names already written out on a piece of paper, and we take them and vote them. That way we don't have to fill out all those papers." Brenda Hunt specifically denied making that statement.

Adrian Lee testified that Eual Hunt had a "slate" card. A "slate" was defined as a group of candidates who pooled their money and efforts in an election. Hunt denied that he had such a card. Lee testified that Hunt told him that the practice was for him alone to assist the voters who so requested. Lee stated that Mrs. Curtis was on Hunt's slate. Hunt also denied making any such statement to Lee.

That Waller and Tooley were working on behalf of Mrs. Curtis, among others, is not disputed. At one point, Waller identifies the slate of candidates which he supported. At several other points he denies remembering who he supported. The candidates which he listed as being on the slate did very well at Fountain Run. Only one of Waller's candidates lost the precinct; most won by very substantial margins.

There was other evidence offered to indicate that something was amiss at Fountain Run: (1) Mrs. Curtis received only 12 votes in the Fountain Run precinct in a prior election where she did not have Waller's support; (2) Mrs. Jernigan had significant ties to the Fountain Run area; Mrs. Curtis did not. However, Mrs. Curtis won the precinct by a 3–1 margin; (3) Things were normally pretty "loose" in Fountain Run. The city clerk testified that 80% of the voters were "floaters" or votes for sale. The city clerk further testified that there were large numbers of people there who were unable to write and for whom he had to endorse checks. James Jernigan testified that he and his wife were among the few husbands and wives who didn't go into the polls together when they voted at Fountain Run, and that individually, they were among the few who didn't have someone peering through the curtain watching them vote.

When the vote of a precinct is challenged on the grounds that the election conducted in the precinct was unfair, the law is: (1) that the vote of a precinct can be thrown out for irregularities in the conduct of the election therein of such magnitude as effectively to destroy any hope that the results as tabulated were a fair indication of the sense of the voters in that precinct and (2) that the result of the election can be determined on the basis of the votes from the remainder of the election territory unless the number of votes in the precinct constituted a substantial portion (20% or more) of the votes in the entire territory. *Upton v. Knuckles*, Ky., 470 S.W.2d 822, 825 (1971).

■ The proof must be of such flagrant, extensive, and corrupt violations as to destroy the fairness and equality of the election. *Upton v. Knuckles, supra*, at 827.

■ It is the opinion of this Court that there was overwhelming evidence of dereliction of duty on the part of the precinct officers, such that it appears that the officers made little if any effort to properly perform their function. There was evidence of an extensive amount of open voting in that husbands and wives were permitted to enter the poll together and that voters were improperly and illegally assisted in casting their votes. That there was evidence of bribery of voters on a determined and significant scale. This combination of factors compels a finding that the election in Fountain Run was so tainted with fraud that the result must be discarded and the election determined on the basis of remaining votes.

It is ORDERED that the judgment appealed from is reversed and the case is remanded to the Monroe Circuit Court for the entry of a judgment declaring Patsy Jernigan to be the Republican nominee for the office of circuit court clerk. It is further ORDERED that, in exercise of this Court's option under K.R.S. 120.075(3), this opinion be final immediately upon rendition.

All concur.